**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **IN THE MATTER OF GABRIEL LASALA, AS OWNER OF THE 2016 WORLD CAT MODEL 295CC, FOR EXONERATION FROM OR LIMITATION OF LIABILITY** | **CIVIL ACTION**<br><br>**NO. 18-11057 c/w 18-11138, 19-9706 19-9798, 19-9819**<br><br>**SECTION D (2)** |

**THIS DOCUMENT RELATES TO ALL CASES**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## I.  INTRODUCTION

This case arises from a vessel's allision with a fixed platform. As described in detail below, on the evening of April 28, 2018, a vessel navigated by Gabriel Lasala allided with a fixed platform owned by Cantium, LLC, in the Gulf of Mexico. Lasala maintains that the allision was caused by Cantium's failure to comply with applicable U.S. Coast Guard regulations for the fixed platform. Cantium maintains that the allision was caused by Lasala's negligence. As a result of the allision, the passengers aboard the vessel, including Lasala, Dale Presser, Dale Presser's minor son, C.P., Marc Junot and Randall Patterson, sustained damages.

Following the allision, various suits were filed.  Lasala filed a Complaint-in-Limitation.[1] Although the Court initially issued a monition,[2] it later granted Cantium's Motion for Partial Summary Judgment Regarding Gabriel Lasala's

---

[1] *See* R. Doc. 1. This consolidated action was originally assigned to another section of this Court and was reassigned to this section upon confirmation of the undersigned. R. Doc. 12.
[2] *See* R. Doc. 3.

Entitlement to Limitation of Liability upon determining that Lasala was at least partially at fault for the allision and had knowledge and privity of his own actions.[3] The Court then lifted the concursus and dissolved the limitation action.[4]

Lasala also asserted a claim of platform negligence against Cantium.[5] The Pressers asserted claims of negligence against Lasala and Cantium.[6] The Pressers have since settled their claims against Cantium.[7] The Pressers' claim against Lasala is included in this opinion. Passengers Marc Junot and Randall Patterson, along with their respective wives, asserted claims of negligence against Lasala and Cantium.[8] The Junots and Pattersons have since settled their claims against both Lasala and Cantium. Cantium has filed a claim against Lasala for damage to the platform.[9] Lasala has asserted certain claims against his insurer, Foremost.[10] The Court has bifurcated Lasala's claims against Foremost, and this opinion does not consider those claims.[11] The Court has dismissed other claims, including intentional spoliation claims asserted against Foremost, Lasala's insurer, and contribution and indemnity claims asserted by Cantium against Lasala.[12] This opinion deals with the remaining claims.

---

[3] R. Doc. 132; R. Doc 217.
[4] R. Doc. 217.
[5] *See* Docket No. 19-9798, R. Doc. 1; *see also* R. Doc. 39.
[6] Docket No. 18-11138, R. Doc. 1; *see also* R. Doc. 38.
[7] *See* R. Doc. 176.
[8] *See* Docket No. 19-9706, R. Doc. 1.
[9] *See* R. Doc. 9; *see also* Docket No. 18-11138, R. Doc. 12; Docket No. 19-9798, R. Doc. 7.
[10] *See* Docket No. 19-9798, R. Doc. 1.
[11] *See* R. Doc. 230; R. Doc. 239.
[12] R. Doc. 238; R. Doc. 266.

The Court has determined that admiralty law applies to the claims asserted in this matter.[13]

This matter was tried before the Court without a jury from June 17, 2021 through June 23, 2021. The Court has carefully considered the testimony of all of the witnesses and the exhibits entered into evidence during the trial, as well as the record in this matter. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court enters the following Findings of Fact and Conclusions of Law. To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such. To the extent any conclusion of law may be construed as a finding of fact, the Court hereby adopts it as such.

## II.    FINDINGS OF FACT

### A.    The Allision

On April 28, 2018, Gabriel Lasala gathered with Randall Patterson, Marc Junot, Dale Presser, and Dale Presser's minor son (C.P.) at Lasala's home in Kiln, Mississippi, for the purpose of going on an overnight fishing trip.[14] Before departing, Lasala inspected his vessel, a 2016 World Cat Model 295CC, to ensure it worked properly, including checking the batteries and bilge pumps.[15] Lasala had also recently done work on the vessel, including replacing one bilge pump and three

---

[13] R. Doc. 180.

[14] June 17, 2021 Trial Testimony of Gabriel Lasala at 33-35. The Court found some portions of Lasala's testimony reliable, though it did not find his entire testimony supported by the evidence and corroborating testimony. Much of Lasala's testimony that the Court found credible was undisputed, supported by the testimony of other witnesses, and/or supported by his recollection as he posted online at the Hull Truth Blog.  *See* Exhibit 127.

[15] *Id.* at 35-37; *see also* June 21, 2021 Trial Testimony of Dale Presser at 56. Photographs of the vessel can be seen in Exhibit 20.

batteries.[16]   Lasala had extensive familiarity with boats, having owned them for approximately forty years.[17] Patterson had experience with boats and had owned boats most of his adult life.[18] Further, he had previously gone fishing with Lasala numerous times on both overnight and day fishing trips.[19] Junot also had done a good bit of in shore fishing in his life and had previously been on offshore fishing trips.[20] The group departed on Lasala's vessel between 2:00 p.m. and 4:00 p.m.[21]

The party initially navigated to Freemason Island, and arrived around sunset.[22] Lasala beached the boat at Freemason Island, and the group fished off the back of the boat for bait fish.[23] Lasala was drinking Bud Light beer and Mike's Hard Lemonade during this time period, but stopped drinking alcohol before sunset.[24] The initial plan had been to spend the night on Freemason Island, and at one point Dale Presser and his son went onto the island in search of firewood.[25] While beached at Freemason Island, Lasala noticed there were issues with the boat.[26] Specifically,

---

[16] June 17, 2021 Trial Testimony of Gabriel Lasala at 27-29.
[17] Id. at 14.
[18] December 15, 2020 Deposition Testimony of Randall Patterson at 16.
[19] Id. at 11.
[20] June 18, 2021 Trial Testimony of Marc Junot at 107.
[21] June 17, 2021 Trial Testimony of Gabriel Lasala at 35; June 18, 2021 Trial Testimony of Marc Junot at 108.
[22] June 17, 2021 Trial Testimony of Gabriel Lasala at 40, 98; June 21, 2021 Trial Testimony of Dale Presser at 58; June 18, 2021 Trial Testimony of C.P. at 54. The Court specifically notes that it found C.P. a credible witness.
[23] June 17, 2021 Trial Testimony of Gabriel Lasala at 41.
[24] Id. at 141-143.
[25] June 18, 2021 Trial Testimony of C.P. at 55; June 21, 2021 Trial Testimony of Dale Presser at 58; June 18, 2021 Trial Testimony of Marc Junot at 112; December 15, 2020 Deposition Testimony of Randall Patterson at 18. Although Lasala disputes that the initial plan was to spend the night on Freemason Island, the Court credits the testimony of the other witnesses over Lasala's as to this issue.
[26] June 17, 2021 Trial Testimony of Gabriel Lasala at 42-47.

Lasala noticed that the bilge light was on.[27] Lasala asked Marc Junot to look in the bilges, which Junot did, but he did not see any water.[28]

Lasala heard over his radio that fish were biting near the Horseshoe Rigs, which were over two hours away.[29] Lasala therefore chose to leave Freemason Island and head for the Horseshoe Rigs.[30] When Lasala attempted to restart the vessel's engines, Lasala could not get the engines to crank, as his batteries were running low.[31] Lasala therefore engaged in an "emergency parallel" in which he could essentially combine the power of the batteries in order to get the engines to crank.[32] The engines would then, in theory, charge the batteries.[33] After getting his engines to start, Lasala noticed that the batteries were charging.[34] Lasala also opened the bilges at this time, and discovered eight to ten inches of water.[35] Other than asking Junot to look in the bilges, Lasala did not advise any of the passengers of the boat issues at this time.

At that point, Lasala departed for the Horseshoe Rigs.[36] About 30-45 minutes later the party stopped at a large rig which was lit up "like a Christmas tree" and

---

[27] *Id*. at 43.
[28] June 18, 2021 Trial Testimony of Marc Junot at 110.
[29] *Id*. at 122, 130; June 17, 2021 Trial Testimony of Gabriel Lasala at 44.
[30] A chart noting the general area that Lasala was navigating can be found at Exhibit 85.  Moreover, Lasala annotated a chart to demonstrate his general path of travel. *See* Exhibit 148.
[31] June 17, 2021 Trial Testimony of Gabriel Lasala at 45.
[32] *Id*.
[33] *Id*.
[34] *Id*.
[35] *Id*. at 46, 100.
[36] *Id*. at 47.

continued to fish for bait.[37] Patterson was asleep while the parties were at the rig.[38] After leaving the rig, Marc Junot and C.P. laid down in the bow of the boat, and C.P. went to sleep.[39] Dale Presser remained awake with Lasala, who navigated the boat toward the Horseshoe Rigs.[40]

While navigating toward the Horseshoe Rigs, the problems Lasala previously experienced with his vessel resurfaced. Specifically, his bilge light was on (indicating that the bilge pumps were actively pumping water out of the vessel), and his batteries were draining.[41] At this point, Lasala turned off his radar and all other electronics other than his navigation lights and his GPS.[42] The radar would have shown platforms in the area Lasala was navigating, including the MP 37 BE platform.[43] Lasala increased the vessel's RPMs, hoping to increase the charge to his batteries.[44] He abandoned the trip to the Horseshoe Rigs, and headed south toward Baptiste Collette and Northeast Pass as a way to get to Venice, a safe port.[45] The vessel was traveling at about 20 to 25 miles per hour.[46] Lasala did not alert anyone aboard the vessel, including Dale Presser (who was awake), of the issues with the vessel or his

---

[37] June 21, 2021 Trial Testimony of Dale Presser at 60; June 18, 2021 Trial Testimony of C.P. at 56; June 18, 2021 Trial Testimony of Marc Junot at 142. Although Lasala did not recall stopping at another rig to fish, the Court finds credible the testimony of the other witnesses over Lasala's as to this issue.
[38] December 15, 2020 Deposition Testimony of Randall Patterson at 21.
[39] June 17, 2021 Trial Testimony of Gabriel Lasala at 50; June 18, 2021 Trial Testimony of Marc Junot at 112.
[40] June 17, 2021 Trial Testimony of Gabriel Lasala at 51; June 21, 2021 Trial Testimony of Dale Presser at 60, 63.
[41] June 17, 2021 Trial Testimony of Gabriel Lasala at 48, 127.
[42] Id. at 49.
[43] June 22, 2021 Trial Testimony of Captain Dave Scruton at 181-82.
[44] June 17, 2021 Trial Testimony of Gabriel Lasala at 51.
[45] Id. at 49-50.
[46] Id. at 51.

decision to abandon the trip.[47] Lasala did not appoint a lookout, or ask Dale Presser or any of the other passengers to help him identify and avoid obstructions.[48] Presser sometimes went to the back of the boat, and did so shortly before the allision discussed below.[49] Visibility was ideal during this time period, and the moon was almost completely full.[50]

Shortly before midnight, between 20-45 minutes after leaving the Christmas Tree platform,[51] Lasala navigated the vessel directly into the north side of the Main Pass ("MP") 37 BE Platform.[52] The allision caused significant damages to the vessel, and harmed the passengers aboard.[53] Dale Presser and Lasala were both trapped under the vessel's T-Top.[54] All of the passengers were eventually able to get onto the platform. Patterson was eventually able to make a mayday call.[55] Hours later, the party was rescued, and Lasala and Dale Presser were airlifted to University Medical Center.[56] The remaining passengers travelled back to land on a Coast Guard boat.[57]

---

[47] *Id.*

[48] *Id.* at 157; June 21, 2021 Trial Testimony of Dale Presser at 90.

[49] June 21, 2021 Trial Testimony of Dale Presser at 63.

[50] June 21, 2021 Trial Testimony of Aubrey Jones at 23, 26.

[51] June 18, 2021 Trial Testimony of Marc Junot at 143; June 21, 2021 Trial Testimony of Dale Presser at 89.

[52] June 17, 2021 Trial Testimony of Gabriel Lasala at 58-59; June 21, 2021 Trial Testimony of Dale Presser at 64; June 18, 2021 Trial Testimony of Marc Junot at 125; December 15, 2020 Deposition Testimony of Randall Patterson at 27.

[53] June 17, 2021 Trial Testimony of Gabriel Lasala at 59-60; June 21, 2021 Trial Testimony of Dale Presser at 64-65.

[54] June 18, 2021 Trial Testimony of C.P. at 58-59.

[55] June 17, 2021 Trial Testimony of Gabriel Lasala at 59-60; December 15, 2020 Deposition Testimony of Randall Patterson at 31; Cory Ciekot Deposition Testimony at 14.

[56] June 18, 2021 Trial Testimony of C.P. at 61-62; December 15, 2020 Deposition Testimony of Randall Patterson at 34.

[57] June 18, 2021 Trial Testimony of C.P. at 62.

**B.    The Nav Aid Light**

1.    *The Platform*

The Main Pass 37 BE ("MP 37 BE") platform is an oil platform off the coast of Louisiana.[58] The platform has existed since the 1960s.[59] Initially owned by Chevron, ownership was transferred to Cantium, LLC ("Cantium") in 2017.[60] As relevant to this dispute, the platform has at times been modified, including to expand its size and to alter the navigational aid light ("nav-aid"). In 2002, Chevron submitted an application to the Minerals Management Service, the predecessor to the Bureau of Safety and Environmental Enforcement ("BSEE"), to modify the platform.[61] At the time of the application, the upper deck of the platform measured 35' x 36.5', and the lower deck of the platform measured 27' x 30'.[62] It is undisputed that as of 2018, at least one side of the platform was longer than 30'.[63] In 2017, Cantium, now the owner of the platform, submitted an Application for a Class 1 Private Aid to the Coast Guard to notify the Coast Guard of change of ownership, which was approved.[64] That application listed only one nav aid light.[65] It also included a picture of the platform, drawn to scale.[66] Cantium's corporate representative admitted that it lacked any

---

[58] *See* Exhibit 85, Exhibit 148.

[59] *See* Exhibit 39.

[60] June 21, 2021 Trial Testimony of Chad Williams at 233.

[61] *See* Exhibit 36 at Cantium 000692.

[62] *See id.* at Cantium 000696.

[63] *See* June 21, 2021 Trial Testimony of Jason Lacoste at 263; June 23, 2021 Trial Testimony of Ronald May at 23.

[64] *See* Exhibit 42.

[65] *Id.*; *see also* June 21, 2021 Trial Testimony of Jason Lacoste at 249.

[66] Exhibit 42 at 5.

waiver from the Coast Guard explicitly stating that the platform could have only one light, should a regulation require that it have two.[67]

The platform has also had various regulatory inspections throughout its lifespan and the platform and the nav-aid light were inspected various times between 2013 and 2018.[68] As noted further herein, the nav aid light had been inspected on April 6, 2018, three weeks before the allision. In his deposition, BSEE inspector Jason Bowens testified that it was not part of an inspector's job to measure oil platforms and confirm they had an adequate number of nav aid lights under the applicable regulation; rather, Bowens testified that BSEE inspectors were focused on the functionality of the nav aids.[69]

### 2.   *The Nav Aid Light*

The parties dispute whether a functioning nav aid light operated on top of the MP 37 BE on the night of the allision. Because this matter is central to the dispute, the Court summarizes the testimony and evidence regarding this issue before making its findings. The nav aid light at issue was a BrightStar Class "A" 5 (nm) LED Marine Lantern and Battery.[70] The light was designed to be seen from five miles away.[71] It was further designed to flash three-tenths of every second.[72] The light was sold by ESSI Corp, and manufactured by Sabik.[73] The light had previously been inspected

---

[67] June 21, 2021 Trial Testimony of Jason Lacoste at 253.

[68] *Id.*at 244-45.

[69] January 15, 2021 Deposition Testimony of Jason Bowens at 13-14, 49.

[70] The light was made available to the Court to view during trial. *See* Exhibit 33.  *See also* Exhibits 29 (pictures of nav aid light); and Exhibit 42 (promotional material).

[71] June 21, 2021 Trial Testimony of Kevin Delcambre at 181; June 21, 2021 Trial Testimony of Jason Lacoste at 213.

[72] June 21, 2021 Trial Testimony of Kevin Delcambre at 187.

[73] January 12, 2021 Deposition Testimony of John Hebert at 15-16.

three weeks earlier, on April 6, 2018, by John Hebert of ESSI, who determined that it was properly functioning at that time.[74]

The eyewitness testimony from the night of the allision is mixed. Lasala and Dale Presser were the only two individuals awake at the time of the allision. Lasala testified unequivocally that he did not see a nav aid light, either before or after the allision.[75] Dale Presser similarly testified that he did not see a light before the allision.[76] C.P. was sleeping prior to the impact and thus did not see any light.[77] C.P. also credibly testified that he was not looking for any light when he was on the platform after the allision.[78] Randall Patterson testified that he could not recall if he saw a light or not after the allision, though he did not deny telling an investigator that he saw a green light.[79] Marc Junot testified that he noticed a green light, which was "not overly bright" and which he only noticed on the top platform.[80] Junot had testified at his deposition that the light was flashing, and he stated that his testimony at his deposition reflected a better recollection of events as it was closer in time to the allision.[81] Finally, Cory Ciekot, a Coast Guard rescue swimmer who landed on the top platform, testified in his deposition that the nav aid light was working properly based on his experience with such lights. He further testified that he saw a steady white light on the top platform.[82]

---

[74] *See* Exhibit 56.
[75] June 17, 2021 Trial Testimony of Gabriel Lasala at 161-63.
[76] June 21, 2021 Trial Testimony of Dale Presser at 106-07; 122.
[77] *Id.* at 57.
[78] June 18, 2021 Trial Testimony of C.P. at 77-78.
[79] December 15, 2020 Deposition Testimony of Randall Patterson at 35-36.
[80] June 18, 2021 Trial Testimony of Marc Junot at 118-20.
[81] *Id.* at 134.
[82] February 22, 2021 Deposition Testimony of Cory Ciekot at 17-18 and 21-22.

Testimony from those who were involved in the retrieval of the light is more straightforward. Cantium was informed of the allision the morning of April 30, 2018.[83] Aaron Landreneau, a Cantium Operations Manager, was navigating around Main Pass 41 inspecting platforms on that morning, and came to MP 37 BE.[84] Landreneau observed debris, including bloodied life jackets and a cooler, on the platform, as well as Lasala's damaged vessel.[85] He silenced the foghorn and radioed his supervisor and Cantium Operator Specialist, Kevin Encalade, who arrived with Lee Smith, a Cantium Instrument and Electrical ("I&E") employee.[86] The three took pictures of the platform, but did not alter the nav aid light.[87] Eventually, they were called back to another platform to meet with a Bureau of Safety and Environmental Enforcement ("BSEE") inspector, Jason Bowens.[88] Once the BSEE inspector arrived, the three Cantium employees traveled with the BSEE inspector to MP 37 BE.[89] At that point, the Cantium employee, in the presence of the BSEE inspector, performed a test of the nav aid light by covering it with tape to imitate dark conditions.[90] The

---

[83] June 21, 2021 Trial Testimony of Casie Caron at 149; June 21, 2021 Trial Testimony of Lee Smith at 169.

[84] June 17, 2021 Trial Testimony of Aaron Landreneau at 254-55.

[85] *Id.* at 262-64.

[86] June 17, 2021 Trial Testimony of Aaron Landreneau at 263-65; June 21, 2021 Trial Testimony of Kevin Encalade at 137; June 21, 2021 Trial Testimony of Casie Caron at 150; June 21, 2021 Trial Testimony of Lee Smith at 169-70.

[87] June 17, 2021 Trial Testimony of Aaron Landreneau at 266; June 21, 2021 Trial Testimony of Kevin Encalade at 139-40; June 21, 2021 Trial Testimony of Lee Smith at 170.

[88] June 17, 2021 Trial Testimony of Aaron Landreneau at 266-67; June 21, 2021 Trial Testimony of Lee Smith at 171; January 15, 2021 Deposition Testimony of Jason Bowens at 10-12.

[89] June 17, 2021 Trial Testimony of Aaron Landreneau at 267; June 21, 2021 Trial Testimony of Kevin Encalade at 140-141.

[90] June 17, 2021 Trial Testimony of Aaron Landreneau at 267-68; June 21, 2021 Trial Testimony of Lee Smith at 172-73; January 15, 2021 Deposition Testimony of Jason Bowens at 13.

nav aid light flashed bright white.[91] The Cantium employee also tested the voltage of the light and confirmed it was proper.[92]

Cantium employees who were on the platform on April 30 testified that they did not alter the light.[93] Moreover, the employees present that day testified that they had no knowledge of the nav aid light's black box or how to use a PDA device, and therefore did not and could not have altered the data stored in the nav aid light's black box.[94] The Court found these witnesses credible and no evidence rebuts their testimony. The Court rejects in its entirety the insinuation made at trial that the Cantium employees troubleshot or in any way altered the nav aid light on the spot to engage in a cover-up.[95] The Court specifically finds that there is no evidence to support this speculation.

The nav aid light contained a black box, which stored critical information regarding the nav aid light's function, including when it turned on and off.[96] Kevin Delcambre, an ESSI employee who developed the black box, testified at trial.[97] Delcambre testified that the data cannot be tampered with.[98] On May 1, 2018, days

---

[91] June 17, 2021 Trial Testimony of Aaron Landreneau at 267-68; June 21, 2021 Trial Testimony of Lee Smith at 172-73; January 15, 2021 Deposition Testimony of Jason Bowens at 23. Kevin Encalade was also contemporaneously told that the light worked. *See* June 21, 2021 Trial Testimony of Kevin Encalade at 142-43.

[92] June 21, 2021 Trial Testimony of Lee Smith at 172.

[93] June 17, 2021 Trial Testimony of Aaron Landreneau at 266.

[94] June 17, 2021 Trial Testimony of Aaron Landreneau at 258-59; June 21, 2021 Trial Testimony of Kevin Encalade at 135-36; June 21, 2021 Trial Testimony of Lee Smith at 166-67.

[95] *See, e.g.,* June 21, 2021 Trial Testimony of Kevin Encalade at 144-46; June 21, 2021 Trial Testimony of Lee Smith at 174.

[96] January 12, 2021 Deposition Testimony of John Hebert at 24.

[97] June 21, 2021 Trial Testimony of Kelvin Delcambre at 183.

[98] *Id.* at 184.

following the allision, John Hebert, a Nav Aid Technician with ESSI, inspected the nav aid light.[99] He found the nav aid to be working properly.[100]

Hebert used a PDA device to obtain data from black box of the nav aid light.[101] Hebert also removed the nav aid light at Cantium's direction.[102] The light was later brought to the 42 Mike platform, where Casie Caron filled out a chain of custody form.[103] The light was brought to Delcambre's office where it was inspected by Jason Lacoste, an Aids to Navigation Service Manager at ESSI.[104] Lacoste determined that the nav aid light worked properly.[105] Lacoste also reviewed the PDA data and found that it demonstrated no problems with the light.[106]

The raw data from the nav aid light's black box which was reviewed by Lacoste demonstrated that the light was working properly on the night of the allision.[107] Lacoste and Robert Bartlett, an expert for Cantium, explained that because the date resets on the nav aid light the record mistakenly dated July 18, 2002 in the black-box data corresponds to April 28, 2018.[108] Lasala's expert Ronald May testified that he agreed with Cantium's expert Robert Bartlett regarding the correlation of the dates from the black box data as reflected in Exhibit 16.[109] The data demonstrated no

---

[99] January 12, 2021 Deposition Testimony of John Hebert at 10-12.
[100] *Id.* at 13; *see also* Exhibit 55.
[101] June 21, 2021 Trial Testimony of Kelvin Delcambre at 190; June 21, 2021 Trial Testimony of Jason Lacoste at 214.
[102] January 12, 2021 Deposition Testimony of John Hebert at 20.
[103] June 21, 2021 Trial Testimony of Casie Caron at 152; Exhibit 59.
[104] June 21, 2021 Trial Testimony of Kelvin Delcambre at 198; June 21, 2021 Trial Testimony of Jason Lacoste at 213-14.
[105] June 21, 2021 Trial Testimony of Kelvin Delcambre at 198.
[106] June 21, 2021 Trial Testimony of Jason Lacoste at 215-16.
[107] *See* Exhibit 15; June 21, 2021 Trial Testimony of Jason Lacoste at 217-18.
[108] June 21, 2021 Trial Testimony of Jason Lacoste at 218-21.
[109] June 23, 2021 Trial Testimony of Ronald May at 43; 54-55.

malfunction of the nav aid light on the night of the allision.[110] The light was eventually transferred to the office of Bartlett Engineering, where various tests were run on it and it was made available to the parties and their experts.[111]

It was stipulated that Robert Bartlett was an expert in mechanical engineering, failure analysis and accident reconstruction.[112] After conducting numerous tests of the battery and the lantern, with and without solar panels, Bartlett testified that it was his opinion that "the battery works, the lantern works, and the data logger tells us that the lantern was working correctly and as intended on the night of the accident."[113] Bartlett's testimony was extensive and specific, including what he termed both "formal" and "informal" tests and the Court found his testimony thorough and supported by the evidence.[114]

The battery which powered the nav aid light was a lead acid deep cycle battery, meaning it is not designed for staring engines, but to provide a smaller amount of current.[115] An October 17, 2019 test of the battery conducted by electrical engineering expert Ronald May with a Midtronics tester in the presence of other individuals indicated that the battery needed to be replaced.[116] A similar test of a brand new

---

[110] *See* Exhibit 15; June 21, 2021 Trial Testimony of Jason Lacoste at 222; June 22, 2021 Trial Testimony of Robert Bartlett at 40-42.  Exhibit 16 includes a table demonstrating a "cleaned up" version of the data.  The data reveals the light turning on at line 63 on the night of the allision, and turning off at line 64 the next morning.

[111] *See* June 22, 2021 Trial Testimony of Robert Bartlett at 37, 48.

[112] *Id.* at 36.

[113] *Id.* at 38.

[114] *See* June 22, 2021 Trial Testimony of Robert Bartlett at 56-57. An example of an "informal" test included Bartlett mapping out a five mile distance, placing the light atop a vehicle at that spot and then positioning himself five miles away where he telephonically communicated each time he saw the lantern flash its light.

[115] June 22, 2021 Trial Testimony of George Mahl at 6-7.

[116] *Id.* at 9, 13-15.

battery with the same tester indicated that the new battery did not need to be replaced.[117] George Mahl, Cantium's electrical engineering expert, testified that the Midtronics tester used in the test which revealed that the battery needed to be replaced was not a proper tool for testing the battery.[118] Mahl testified that the Midtronics tester was designed for cranking batteries and required a high number of amps. While the new battery would still pass such a test, the test is not an accurate assessment of when the battery would need to be replaced.[119] Lasala failed to offer persuasive evidence to contradict Mahl's testimony. Indeed, Ronald May, Lasala's electrical engineer expert who assisted in conducting the test of the battery, conceded during his testimony that even after the Midtronics battery tester indicated that the battery should be replaced the battery continued to power the light for over one week operating 24/7.[120] Moreover, the voltage was checked and considered sufficient on both April 6, 2018, three weeks before the allision, and May 1, 2018, immediately following the allision.[121] Further, Mr. May testified that there was no finding of electrical malfunction with the light.[122] Accordingly, the Court finds that there was no battery issue which prevented the nav aid light from working the night of the allision.

Considering all of the testimony and record before it, the Court finds that the nav aid light was working properly on the night of the allision. Although Lasala and

---

[117] *Id.*
[118] *Id.*
[119] *Id.* at 13-15.
[120] June 23, 2021 Trial Testimony of Ronald May at 34-35.
[121] *See* Exhibits 55 and 56.
[122] June 23, 2021 Trial Testimony of Ronald May at 31.

Presser testified that they did not see a light upon approach to the platform, the fact that they failed to see the light does not necessarily mean that the light was not properly functioning. Further, although Lasala, Presser, and C.P. testified that they did not see a light after the allision, the evidence revealed that Lasala, Presser, and C.P. were on the bottom level of the MP 37 BE platform, where the light, which was on the top level, would not be visible.[123] Further, and crucially, all three had just been involved in a major boating accident, with Lasala and Presser suffering serious injuries and with a primary focus on rescue. Lasala testified that he was in pain and confused about some events immediately following the allision, even passing in and out of consciousness during the rescue.[124] Presser testified that he remembered "bits and pieces" but was just "checked out" while on the platform awaiting rescue.[125] C.P. understandably and credibly testified that the events following the allision were "crazy" and he "just sat by his dad" and never went to the top deck.[126] Junot testified at one point that he believed he saw a flashing light after the allision.[127] Patterson testified in his deposition that he did not recall seeing a light after the allision but if he told an investigator shortly after the incident that he had seen a light, then maybe he did.[128] Neither Junot nor Patterson were awake before the allision.[129] Although

---

[123] *See* June 21, 2021 Trial Testimony of Kelvin Delcambre at 189 (explaining that the light would be dimmer underneath it). The Court is aware that C.P. briefly went up to the second floor of the deck but then returned to the bottom floor. He did not go up to the top deck. *See,* June 18, 2021 Trial Testimony of C.P. at 59-60 and 77-78.

[124] June 17, 2021 Trial Testimony of Gabriel Lasala at 184-187; June 18, 2021 Trial Testimony of Marc Junot at 116.

[125] June 21, 2021 Trial Testimony of Dale Presser at 66-67.

[126] June 18, 2021 Trial Testimony of C.P. at 59-60.

[127] June 18, 2021 Trial Testimony of Marc Junot at 134-35.

[128] December 15, 2020 Deposition Testimony of Randall Patterson at 35-38.

[129] June 18, 2021 Trial Testimony of Marc Junot at 118-19.

the Coast Guard rescue swimmer recalled a steady light, other aspects of his testimony demonstrate that his memory was not perfect. For example, he testified that the platform had only two levels, when it undisputedly had three levels. Particularly in light of the mixed eyewitness testimony, the Court finds that the evidence of the April 30, 2018 test, the subsequent tests, and the objective black box data is convincing evidence that the nav aid light was functioning properly on the night of the allision. The Court found Mr. Bartlett's testimony particularly credible and reliable based on his testing methods and detailed explanations for his opinions. Taken together, the evidence that the nav aid light and battery worked properly and was functioning far outweighs any evidence that the nav aid light may have been faulty on the night of the allision.

The Court further addresses an issue it has already ruled on: alleged spoilation by Cantium in taking the nav aid light down from the platform immediately following the allision.  The Court previously ruled that Lasala had no spoilation claim—and could not obtain an adverse inference against Cantium—because it could not prove bad faith.[130] This reasoning was borne out through testimony at trial. The Court finds that Cantium's action in removing the nav aid light was an act of evidence *preservation* rather than spoilation. Delcambre testified that fisherman sometimes steal items from platforms.[131] Lacoste testified that nav aids were sometimes tampered with or damaged.[132] Williams testified that Cantium had lights tampered

---

[130] R. Doc. 285 at 6-8.
[131] June 21, 2021 Trial Testimony of Kelvin Delcambre at 192.
[132] June 21, 2021 Trial Testimony of Jason Lacoste at 226.

with and broken.[133]  Indeed, Lasala's expert testified that he was not retained until December 2018, a whole hurricane season following the allision.[134] Accordingly, the testimony at trial reinforced the Court's earlier decision that there was no bad faith in removing the evidence.

### C.   Damages

#### 1.   *Lasala's Claimed Damages*

As a result of the allision, Lasala incurred injuries to his left shoulder, arm, and hand.[135] He required multiple surgeries, including significant surgery to his hand and fingers and has permanent plates and screws in his arm.[136] Lasala claims $220,000 based on past medical expenses.[137] Lasala was billed $158.088.10 for his medical procedures.[138] Of that amount, $30,528.51 was paid to satisfy the medical bills.[139] Lasala was treated by Dr. Richard Celentano following the allision in 2018, but did not return in late 2018, 2019, or in 2020 for any additional treatment.[140] Dr. Celentano testified at trial that his records reflected that Lasala returned to work by June 25, 2018 and inquired about, and was cleared, to perform an operation on July 9, 2018.[141] He seeks general damages of $1,500,000.00.[142] Lasala seeks past wages in

---

[133] June 21, 2021 Trial Testimony of Chad Williams at 245.

[134] June 23, 2021 Trial Testimony of Ronald May at 51.

[135] *See* June 17, 2021 Trial Testimony of Gabriel Lasala at 66-91; June 18, 2021 Trial Testimony of Dr. Richard Celentano at 3-40.

[136] *Id.*

[137] *See* R. Doc. 273 at 8.  *See also* Exhibits 92-101. That said, the Court notes that Lasala's Summary of Medical Expenses, R. Doc. 302, which is unopposed, reflects total medical expenses billed of $158,088.10. Lasala has not accounted for his claim for $220,000.00 in past medical expenses.

[138] *See* R. Doc. 302.

[139] *Id.*

[140] June 18, 2021 Trial Testimony of Dr. Richard Celentano at 35-36.

[141] *Id.* at 33-34.

[142] *See* R. Doc. 273 at 7.

the amount of $629,544.00 as well as future wage losses of $4,329,531.00 and past and future expenses for household and office help.[143] Further, the parties stipulated that were Nancy Favaloro, a licensed rehabilitation counselor, to have testified at trial, she would testify that "according to MedAxiom, the pool of physicians dropped significantly over the age of 70 and represents that just 4 percent of the total cardiology workforce is 10 years past that 60th birthday."[144]

### 2.  *Dale Presser's Claimed Damages*

As a result of the allision, Presser sustained multiple abrasions and contusions, fractured ribs, and a severe right leg injury which required a hematoma evacuation, a muscle reattachment, multiple debridement surgeries, and surgery to remove dead skin which required a full thickness skin graft of his right thigh area.[145] Presser was billed $305,389.56 for his medical procedures.[146] Of that amount, $44,062.23 was paid to satisfy the medical bills.[147]

For several months after the accident, Presser was wheelchair-bound due to his leg injuries. For some time after the accident, he could not perform any cardiovascular surgeries. He hired a nurse practitioner to assist him with his hospital rounds, whom he pays $120,000 annually. Presser now endures chronic lymphedema.[148] Presser has also had his recreation limited, and cannot engage in

---

[143] *See* R. Doc. 273. The past wage losses sought are reflected as both $629,544 and $629,511 in Lasala's Proposed Findings of Fact and Conclusions of Law.

[144] Trial Transcript June 21, 2021 at 210 and R. Doc. 296.

[145] June 21, 2021 Trial Testimony of Dale Presser at 64-87; 95-96, 108-126; *see also* June 18, 2021 Trial Testimony of Dr. Ramy El Khoury at 147-67; June 21, 2021 Trial Testimony of Dr. Abigail Chaffin at 3-14; June 18, 2021 Trial Testimony of Dr. Marco Hidalgo at 41-48.

[146] *See* Exhibit 1; *see also* Exhibits 3, 5-7, 11.

[147] *Id.*

[148] June 18, 2021 Trial Testimony of Dr. El Khoury at 152.

activities he once enjoyed, including skiing. He seeks general damages of $1,000,000.00. Dale Presser seeks past wages in the amount of $348.033.00 as well as future wage losses of $5,683,145.00

### 3.  *C.P.'s Claimed Damages*

As a result of the allision, C.P. sustained multiple contusions and abrasions, a right-hand injury, and what was initially diagnosed as a fractured cervical vertebrae.[149] C.P. was treated at University Medical Center immediately following the accident, and had various follow-up appointments for his injuries.[150] Although C.P.'s injuries initially indicated a fractured vertebrae which required him to wear a neck brace and prevented him from fully participating in recreation, including tennis, his doctor released him to normal activities in May 2018,[151] and by August 2018 he had fully recovered.[152] C.P.'s total medical costs billed were $24,361.40.[153] Of that amount, $4,525.26 was paid to satisfy the bills.[154] C.P. seeks general damages in the amount of $105,000.00.

### 4.  *Cantium's Damages*

Cantium claims damages from the allision, primarily from property damage to the MP 37 BE platform.[155] Cantium claims damages as follows: (1) $225.19 for Acme Trucking for transport of vessel items recovered from platform;[156] (2) $9,893.57 for

---

[149] *See* June 18, 2021 Trial Testimony of C.P. at 64-65; Exhibits 2 & 4.
[150] *See* June 18, 2021 Trial Testimony of C.P. at 64-65; Exhibits 2 & 4.
[151] June 9, 2021 Deposition Testimony of Dr. Jeremy James at 23.
[152] June 18, 2021 Trial Testimony of C.P. at 66, 73, 76.
[153] Exhibit 2 at 1.
[154] *Id.*
[155] *See* R. Doc. 283 at 2.  Although the amounts listed in the Pretrial order differ, *see* R. Doc. 245 at 38, these amounts were edited when the Court pointed out an arithmetic error.
[156] Exhibit 65.

Triton Diving Service, LLC for inspection of platform after allision;[157] (3) $977.01 for RWO Oilfield Consultants, LLC for inspection of platform after allision;[158] (4) $3,355.25 for Fugro USA Marine, Inc. underwater surveys of the platform area, including pipelines;[159] and (5) $1,535.00 for Total Safety for retrieval of the nav aid system batteries and solar panels at the request of the Plaintiffs.[160] Cantium has established these damages through a joint stipulation of the evidence cited above.[161] Cantium also claims $4,056.60 for Liberty Self Storage for the storage of vessel items recovered from the platform.[162] The invoices and statements before the Court, however, total only $2,296.61 for Liberty Self Storage.[163] Accordingly, the Court finds that Cantium has only established $2,296.61 for its Liberty Self Storage damages. Taken together, Cantium has established damages paid of $18,282.63.

## III.  CONCLUSIONS OF LAW

### A.  Jurisdiction

This case arises under admiralty jurisdiction pursuant to 28 U.S.C. § 1333 and is an admiralty action within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. The Court has previously made a finding as to jurisdiction.[164]

---

[157] Exhibit 69.

[158] Exhibit 67.

[159] Exhibit 66.

[160] Exhibit 68.

[161] R. Doc. 283.

[162] R. Doc. 280-3 (Stipulation). The amount Cantium seeks for the Liberty Self Storage costs has changed multiple times. *Compare* R. Doc. 248 at 42 (Cantium's proposed findings of fact and conclusions of law, seeking $3,836.61) *and* R. Doc. 245 at 38 (Pretrial Order, in which Cantium states it seeks $4,386.61 for Liberty Self Storage costs).

[163] *See* Exhibit 46.

[164] *See* R. Doc. 180.

**B.      Liability**

A primary question before the Court is who is liable for the allision, and the degree of liability each party shares for the allision. The Supreme Court has held that "when two or more parties have contributed by their fault to cause property damage in a maritime [allision], liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible to fairly measure the comparative degree of their fault."[165]

"General principles of negligence guide the analysis of a maritime tort case."[166] "To state a claim for relief under maritime law, the 'plaintiff must demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury."[167] "Under maritime law, a plaintiff is owed a duty of ordinary care under the circumstances."[168] Further, "[t]o give rise to liability, a culpable act or omission must have been 'a substantial and material factor in causing the [allision].'"[169]

The parties invoke two maritime presumptions: the Oregon Rule, and the Pennsylvania Rule. The Oregon Rule "provides that a moving vessel that allides with

---

[165] *United States v. Reliable Transfer*, 421 U.S. 397, 411 (1975).

[166] *Casaceli v. Martech Int'l, Inc.*, 774 F.2d 1322, 1328 (5th Cir. 1985).

[167] *In re Great Lakes Dredge & Dock Co., LLC*, 624 F.3d 201, 211 (5th Cir. 2010) (quoting *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000) (internal quotation omitted)).

[168] *Id.* (citing *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980)).

[169] *Am. River Trans. Co. v. Kava Kaliakra SS*, 148 F.3d 446, 450 (5th Cir. 1998) (quoting *Inter-Cities Navig. Corp. v. United States*, 608 F.2d 1079, 1081 (5th Cir. 1979)).

a stationary object is deemed to be presumptively at fault for the negligence."[170]
"[T]he scope of the *Oregon* rule, which speaks explicitly only to a presumed breach on
the part of the alluding vessel, . . . is not a presumption regarding the question of
causation (either cause in fact or legal cause) or the percentages of fault assigned
parties adjudged negligent."[171] "If a defendant comes forward with evidence to rebut
the presumption, a court must consider such evidence."[172] Importantly here, "the
alliding-vessel presumption of fault is not a presumption of *sole* fault."[173] The Oregon
Rule's "presumption derives from the common-sense observation that moving vessels
do not usually collide with stationary objects unless the vessel is mishandled in some
way."[174] Moreover, "*The Oregon* presumption 'only applies in the absence of evidence
of fault.'"[175]

Unlike the Oregon Rule, which deals with the presumption of breach, the
Pennsylvania Rule concerns the burden of proving causation. Under that rule "any
party to a maritime accident who violates a federal statute is presumed to be at fault,
and thus, has the burden of proving that the violation could not have been a
contributing cause of the allision."[176] In order for the Pennsylvania Rule to apply, a
party must demonstrate three elements:  "(1) proof by a preponderance of evidence of

---

[170] *N.D. Shipping, S.A. v. ZAGORA M/V*, No. 06-10734, 2009 WL 1606877, at *5 (E.D. La. June 5, 2009) (citing *The Oregon*, 158 U.S. 186, 197 (1895)).
[171] *In re Mid-South Towing Co.*, 418 F.3d 526, 532 (5th Cir. 2005).
[172] *Vinson v. Cobb*, 501 F. Supp. 2d 1125, 1132 (E.D. Tenn. 2007).
[173] *Impala Terminals Burnside LLC v. Marquette Transportation Company, LLC*, No. 19-12584, 2021 WL 1123566, at *5 (E.D. La. Mar. 24, 2021) (quoting *Combo Maritime*, 615 F.3d at 608).
[174] *American Petrofina Pipeline Co., v. M/V Shoko Maru*, 837 F. 2d. 1324 (5th Cir. 1988), citing *Delta Transload*, 818 F.2d at 449; *Bunge*, 558 F.2d at 795.
[175] *Id.* (quoting *In re Omega Protein, Inc.*, 548 F.3d 361, 368-69 (5th Cir. 2008)).
[176] *Impala Terminals*, 2021 WL 1123566, at *6 (citing *The Pennsylvania*, 86 U.S. 125 (1873)).

violation of a statute or regulation that imposes a mandatory duty; (2) the statute or regulation must involve marine safety or navigation; (3) the injury suffered must be of a nature that the statute or regulation was intended to prevent."[177]

        1.    *Lasala's Liability*

      The Court first considers Lasala's liability in this matter. After careful consideration of the testimony and evidence in the record, the Court finds that Lasala failed to exercise reasonable care and was negligent in several distinct ways.[178] In reaching this conclusion, the Court deeply considered the testimony of the parties' experts, including Captain Dave Scruton, Ron Campana, and Charles Clark. Although the Court appreciates the insights of Campana and Clark, it ultimately finds Scruton's testimony more persuasive, as described below.

      First, Lasala was negligent in leaving the safe harbor of Freemason Island while he knew there were mechanical issues with his vessel.[179] Lasala knew he had 8-10 inches of water in his bilge while the boat was on Freemason Island. Further, he knew that three batteries he had just installed in his vessel had drained remarkably quickly, such that he had to use an emergency parallel to restart the engines. Indeed, at the time Lasala left Freemason Island, the vessel was not fit for its intended purpose. It is undisputed that Lasala did not advise any of his passengers of the

---

[177] *In re Marquette Transportation Co.*, 292 F. Supp. 3d 719, 729 (E.D. La. 2018) (citing *United States v. Nassau Marine Corp.*, 778 F.2d 1111, 1116-17 (5th Cir. 1985)).

[178] Having determined that Lasala was negligent under general maritime law on a fulsome record, the Court need not resort to the presumption of the *Oregon* rule. *See Impala Terminals*, 2021 WL 1123566, at *7-8 ("Insofar as the Oregon Rule 'presumptively allocates fault when the circumstances of an allision are [relatively] unknown,' many courts decline to presume fault where there is a developed factual record concerning the circumstances of an allision.").

[179] *See generally* June 22, 2021 Trial Testimony of Captain Dave Scruton at 154, 166.

mechanical issue, beyond asking Junot to look in the bilges. Lasala ignored these problems and decided to abandon the initial plan to spend the night on Freemason Island and instead embark in an hours-long journey to fish at night in open water. This was not an act of ordinary care under the circumstances. Moreover, this was a substantial factor in the collision. This is true standing alone, but it is particularly true considering it caused Lasala to make a series of other imprudent decisions that further contributed to the allision.

Lasala was also negligent in turning off his radar.[180] The evidence is undisputed that the radar would have showed the platform at issue, and had it been engaged Lasala would almost certainly have been able to detect and avoid the platform. Lasala's expert in boat operations and navigational rules, Charles Clark, agreed in his testimony that Lasala should not have run into the platform had his radar been operating and used properly.[181] The decision to turn off the radar at night while navigating a vessel through an area known to have numerous platforms was not reasonably prudent. Further, Lasala testified that he increased the boat's RPMs after turning off his radar. The Court is persuaded by Captain Scruton's testimony that "[s]afe speed and lookout both go together and if you're to turn off your radar, it doesn't make sense to increase speed" in finding this action negligent as well.[182] Lasala's purported explanation for turning off his radar—a concern for the battery life of the batteries on the vessel—is rejected. The evidence revealed that the radar

---

[180] *See generally id.* at 181-82.
[181] June 17, 2021 Trial Testimony of Charles Clark at 217.
[182] June 22, 2021 Trial Testimony of Captain Dave Scruton at 172.

pulled from the house battery, not from the crank batteries. Evidence at trial also revealed that the batteries lasted many hours after the allision, suggesting that Lasala's assessment of his battery life was deeply mistaken. The Court further notes that Lasala's action violated the Inland Rules of Navigation.[183]  Rule 7 of the Inland Rules of Navigation states that "Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects."[184] Under the Pennsylvania Rule, this regulatory violation shifts the burden of causation to Lasala to prove that his failure to properly use his radar was *not* a cause of the allision.[185]  This is a burden Lasala has not carried.

Lasala was also negligent in failing to appoint a lookout.[186] Dale Presser could have served as a lookout, as he was awake and otherwise unoccupied. Lasala also could have awoken Patterson, who testified that he had owned boats most of his adult life and had been on fishing trips with Lasala previously, and asked him to be a lookout.[187] The Court rejects the proposition of Lasala's expert, Charles Clark, that

---

[183] The experts for both parties cited to the Inland Rules of Navigation, seemingly conceding they apply in this situation. Little testimony was adduced as to whether specific actions of Lasala's occurred within the lines of demarcation. At any rate, the parallel rules, the International Regulations for Preventing Collisions at Sea, are in all material manners identical to the Inland Navigation Rules cited here. *See,* June 22, 2021 Trial Testimony of Captain Dave Scruton at 225.

[184] 33 C.F.R. § 83.07.

[185] The Court does not find that Lasala was excused from compliance with Rule 7 because of Rule 2. Rule 2(b) of the Inland Rules of Navigation states that "In construing and complying with these Rules, due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger."  For the reasons described above rejecting Lasala's explanation for turning off the radar, the Court does not find that "special circumstances" merited a departure from Rule 7.

[186] *See generally* June 22, 2021 Trial Testimony of Captain Dave Scruton at 169-70.

[187] December 15, 2020 Deposition Testimony of Randall Patterson at 16.

Presser could not have served as a lookout because he did not have experienced eyes.[188] Given the conditions under which Lasala was travelling, *i.e.,* at night and without radar in a boat experiencing mechanical issues, a reasonably prudent person would have requested that Presser, or any other able adult aboard (especially those aboard with boating experience), assist in looking for obstructions.

Further, Lasala's failure to do so violated yet another of the Inland Rules of Navigation. Rule 5 of the Inland Rules of Navigation states that "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision."[189] This again shifts the burden of causation to Lasala to prove that his failure to appoint a proper look-out could not have been a cause of the allision; and again, this is a burden Lasala has not carried. The Court rejects the proposition pressed by Ron Campana that Presser could not have been a "proper" lookout because of his lack of experience at sea.[190] Under the circumstances, Presser could have assisted in looking out for the obstructions such as the platform. Instead, because he was not apprised of the situation, Presser testified that he "wasn't paying attention to what was in front of us . . . I figured we had GPS and radar and all that stuff that was good enough."[191] The little caselaw which exists on the definition of a "proper lookout" holds that "[p]roper lookouts are competent persons other than the master and helmsman, properly stationed for that

---

[188] *Id.*; *see also* June 17, 2021 Trial Testimony of Charles Clark at 218-19.
[189] 33 C.F.R. § 83.05.
[190] *See* June 23, 2021 Trial Testimony of Ronald Campana at 72.
[191] June 21, 2021 Trial Testimony of Dale Presser at 63.

purpose on the forward part of the vessel."[192] Presser, as well as any of the two other adult passengers, could fall within this definition. Additionally, though not discussed above, the Court notes Captain Scruton's testimony that "any captain's first priority if the safety of their passengers and crew and, of course, their vessel."[193] The Court attaches great weight to Captain Scruton's opinion that, given the circumstances, Lasala should have immediately awoken his passengers, if for no other reason, to have them put on the personal flotation devices, something he failed to do.[194] Captain Scruton testified, and the Court finds persuasive, that the greatest risk to a passenger in a vessel is drowning and the captain's responsibility is to ensure the safety of his passengers.[195] The evidence revealed that Lasala instructed his passengers to put on their life preservers only after the allision.[196]

Lasala was also negligent in his choice of route.[197] When Lasala decided that the boat's mechanical issues caused him to abandon his fishing trip, he testified that he planned to head south toward Baptiste Collette and Northeast Pass as a way to get to Venice, a safe port. Venice was well over an hour away. A much safer route would have been to return to Freemason Island, where he could have called a local boat towing company. The evidence also revealed that there were other islands that were in closer proximity where he could have navigated the boat. Indeed, were the

---

[192] *The Ottowa*, 70 U.S. 268, 273 (1865). Some caselaw has suggested that a "proper lookout" is "a competent and attentive lookout." *See Smith v. Bacon*, 194 F.2d 203, 206 (5th Cir. 1952); *see also G.B. Zigler Co. v. Barker Barge Line*, 167 F.2d 676, 678 (5th Cir. 1948). Under these circumstances, Presser could fall within the ambit of this definition also.
[193] June 22, 2021 Trial Testimony of Captain Dave Scruton at 165.
[194] *Id*. at 168.
[195] *Id*. at 169.
[196] June 17, 2021 Trial Testimony of Gabriel Lasala at 71.
[197] *See* June 22, 2021 Trial Testimony of Captain Dave Scruton at 173.

situation as dire as Lasala testified he believed it to be at the time, a choice to go to the nearest safe port or area of safety for his passengers would have been a reasonably prudent decision. Choosing to continue to travel to a port hours away, which required navigating past numerous oil platforms, at night, was not a reasonably prudent decision.

This finding is confirmed by Lasala's own navigational expert, Charles Clark, who testified that he would have kept his track "on the quickest port that I could possibly get my boat into at that time."[198] The Court rejects Mr. Clark's testimony that Freemason Island was not "traditionally what you would call a safe harbor" because "you're not going to be able to do anything on that island but stay on the island with the mosquitos and gnats.[199] Instead, the Court relies on the testimony of Captain Scruton who testified "It's better staying at an island overnight and get bitten by bugs and mosquitos, as Mr. Clark said, rather than spend the night on a platform in pain and suffering."[200] The Court found it particularly persuasive that Captain Scruton used maps to identify various closer safe harbors, including Freemason Island and Lasala's home in Kiln, and testified that returning to any of those nearer harbors would have been more prudent under the circumstances.[201] Moreover, Lasala's poor choice of route was a substantial cause of the allision, as it led Lasala directly into the MP 37 BE. The evidence further revealed that Lasala could have kept the boat in the safety fairway, a two-mile wide navigational route

---

[198] *See* June 18, 2021 Trial Testimony of Charles Clark at 231-32.
[199] *Id.* at 206.
[200] June 22, 2021 Trial Testimony of Captain Dave Scruton at 166.
[201] *Id.* at 173-74 and 191-93.

without any rigs or other obstructions. Lasala himself conceded at trial that it was "safer in the middle of the fairway."[202] Additionally, Mr. Clark testified that Lasala would not have hit the platform if he had been traveling the fairway and stayed in the middle.[203]

Finally, Lasala was negligent in failing to see the platform and the nav aid light. This finding is necessarily premised on the Court's finding that the light was working on the night of the allision. Lasala's failure to see the light and the platform, and therefore avoid the platform, was grossly negligent, and was the most substantial factor in causing the allision.[204] Further, the evidence revealed that it was Presser, not Lasala, who first saw the platform, and he was not looking for obstacles at the time.[205]

The Court notes that having found that Lasala breached a duty ordinary care which caused the allision, the fourth element of general maritime negligence— damages—is not seriously contested, as all parties recognize that the allision caused the damages in this matter.

During trial, Lasala moved for a directed verdict as to causation, arguing that Cantium's failure to properly light the MP 37 BE platform was a superseding cause

---

[202] June 17, 2021 Trial Testimony of Gabriel Lasala at 122.

[203] *See* June 18, 2021 Trial Testimony of Charles Clark at 230.

[204] During trial, parties pressed other arguments for why Lasala was negligent, including his failure to maintain paper charts. The Court rejected the argument related to the paper charts in light of the fact Lasala had a GPS on his vessel, albeit one that did not prevent him from alliding with the MP 37 BE. It was further implied at trial that Lasala never abandoned the fishing trip, and hit the platform while on his way to the Horseshoe Rigs. Although there is some evidence in the record to support such a finding, *see* Exhibit 127 (Hull Truth Blog), the Court ultimately rejects such an argument in its finding of facts.

[205] June 21, 2021 Trial Testimony of Dale Presser at 92.

of the allision.[206] As the Supreme Court stated in *Exxon Co., U.S.A. v. Sofec, Inc.*, "[t]he doctrine of superseding cause is . . . applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable."[207] The Supreme Court also stated that "[s]uperseding cause operates to cut off the liability of an admittedly negligent defendant, and there is properly no apportionment of comparative fault where there is an absence of proximate causation."[208] The Fifth Circuit has held that a third-person's act is not a superseding cause to an actor if "(a) the actor at the time of the negligent conduct should have realized that a third person might so act; (b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or (c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent."[209]

The Court's finding that the nav aid light was working is fatal to Lasala's motion. Further, the Court does not find that Cantium's failure to light MP 37 BE with two lights is a superseding cause of the allision. Although Cantium's failure to do so violated an applicable regulation, it cannot be described as "highly extraordinary" or "extraordinarily negligent" and the Court does not find it to be so.

---

[206] June 22, 2021 Trial Transcript at 230.
[207] 517 U.S. 830, 837 (citing 1 T. Schoenbaum, Admiralty and Maritime Law § 165-166 (2d ed. 1994)).
[208] *Id.* (citing 1 T. Schoenbaum, Admiralty and Maritime Law § 165-166 (2d ed. 1994)).
[209] *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F.2d 646, 652 (5th Cir. 1992) (citing *Nunley v. M/V Dauntless Colocotronis*, 727 F.2d 455, 464-65 (5th Cir. 1984)).

Moreover, the Court has already found that Lasala's negligent acts were proximate causes of the allision. The Court therefore denies Lasala's oral motion, and applies the doctrine of comparative fault to determine the proportion of liability between Lasala and Cantium.[210]

### 2. *Cantium's Liability*

The Court next turns to Cantium's liability.  The Court has already found that there was a single working nav aid light atop the MP 37 BE the night of the allision. But this does not end the inquiry. To the extent Cantium violated any regulation designed to prevent an allision, it may be partially liable for the allision at issue in this case.

The Court begins by considering 33 C.F.R. § 67.05-1(b).  That regulation provides:

> Structures having a maximum horizontal dimension of over 30 feet, but not in excess of 50 feet, on any one side, or in diameter, shall be required to have two obstruction lights installed on diagonally opposite corners, 180° apart, or as prescribed by the District Commander, each light to have a 360° lens.[211]

The regulation further provides that "all obstruction lights shall be installed in a manner which will permit at least one of them to be carried in sight of the mariner, regardless of the angle of approach, until the mariner is within 50 feet of the structure, visibility permitting."[212]

---

[210] *See, e.g., In re Omega Protein, Inc.*, 548 F.3d 361 (5th Cir. 2008) (applying comparative fault under similar facts).
[211] 33 C.F.R. § 67.05-1(b).
[212] *Id.* § 67.05-1(f).

It is undisputed that at the time of the allision, the platform had a side that was between 30 and 50 feet. It is further undisputed that the platform had only one nav aid light.  Accordingly, Cantium violated the plain language of 33 C.F.R. § 67.05-1(b). This acted as a breach of Cantium's duty of care under general maritime law.[213] Further, Lasala has demonstrated that Cantium violated 33 C.F.R. § 67-05-1(b), that that statute involved marine safety or navigation, and that the statute was intended to prevent such allisions which prompts application of the Pennsylvania Rule. Under the Pennsylvania Rule, the burden of causation shifts to Cantium to prove that its failure to light the platform with two lights was *not* a cause of the allision. Cantium fails to carry this burden. Indeed, had the platform had two working nav aid lights the night of the allision, Lasala would have been more likely to see one of them and avoid the platform.

The language "or as prescribed by the District Commander" in 33 C.F.R. § 67-05-1(b) does not alter this conclusion. Cantium has provided evidence that the Coast Guard approved an Application for Class 1 Private Aid to Navigation for the MP 37 BE in 2017 that listed only one nav aid light.[214] However, Cantium has not demonstrated that this application constitutes a waiver by the District Commander. Cantium's corporate representative explicitly conceded that they had no such waiver.[215] The application was not designed to bring to the Coast Guard's attention

---

[213] *See Rose Crewboat Services, Inc. v. Wood Resources, LLC*, 425 F. Supp. 3d 668, 674-75 (E.D. La. 2019) (explaining that violation of a Coast Guard regulation constitutes negligence *per se*).

[214] *See* Exhibit 42.

[215] The Court rejects the insinuation made at trial that such a waiver might exist, but was not produced by either Chevron or the Coast Guard because of poor record keeping. *See* June 22, 2021 Trial Testimony of Richard Dinapoli at 152. Whether this is accurate or not, it does not relieve Cantium

that the platform exceeded 30 feet but had only one nav aid light. Indeed, the only indication on the application that the platform exceeded 30 feet was a scaled drawing that requires interpretation to understand the size of the platform.[216] Accordingly, the Court does not find evidence to support that the District Commander waived the requirement that the platform have two nav aid lights.

Further, the Court does not find that successful BSEE inspections constitute a waiver by the District Commander of the requirement for two nav aid lights on the MP 37 BE platform. As an initial matter, a successful inspection by BSEE is not a "prescription by the District Commander [of the Coast Guard]" as the regulation contemplates a waiver directly from the District Commander, not an organization within the Department of Interior. Although 33 C.F.R. § 140.101 provides that "BSEE inspectors may inspect fixed OCS facilities, to determine whether the requirements of this subchapter are met,"[217] there was no evidence introduced at trial to support that the regulation confers on BSEE the ability to waive compliance with § 67.05-1(b). That authority is reserved only for the Coast Guard. Moreover, as testified to by BSEE investigator Bowens, BSEE was focused on the *function* of the nav aids, rather than the size of the platform and the whether it had the appropriate number of nav aids. Bowens clearly testified in his deposition that he did not consider it a BSEE investigator's role to verify platform measurements.[218]

---

from its burden of production by arguing (in the abstract) that third parties may have poor record-keeping.

[216] *See* Exhibit 42 at Cantium 000098.

[217] 33 C.F.R. § 140.101(c).

[218] *See* January 15, 2021 Deposition Testimony of Jason Bowens at 49-50.

Further, Section 67.05-1(f) does not shield Cantium from liability here. Cantium argues that Section 67.05-1(f) requires that only one light be visible to mariners on approach and, since the one nav aid light was functioning and visible, then Cantium was compliant with the regulation. Cantium contends that even if it were required to have two lights on the platform, the only light that was required by the regulation to be visible to Lasala was the nav aid the Court found to be working. The Court does not find Cantium's expert's opinion either persuasive or supported by the law. Cantium's argument fails because it presupposes that Cantium complied with the requirements of Section 67.05-1(b), which required two nav aid lights under these circumstances. The Court finds that the lack of a second light is itself a statutory violation that is *per se* negligence and invokes the Pennsylvania Rule, whether or not that light would be separately required to have been able to be seen by Lasala under a separate provision of the regulation. Had the platform had two working nav aid lights—as unequivocally required by Section 67.05-1(b)—Lasala would have been more likely to have seen one of them, even were the second light positioned on the far side of the platform.

The Court does not find that Cantium separately violated 33 C.F.R. 67.05-1(f) because the light was not visible to Lasala under the T-Top of his vessel at fifty feet away from the structure. The regulation requires that "[a]ll obstruction lights shall be installed in a manner which will permit at least one of them to be carried in sight of the mariner . . . until the mariner is within 50 feet of the structure, visibility

permitting."[219] Although Lasala may not have personally been able to see the light at fifty feet away because of his vessel's T-Top, there is no evidence that the light was not permitted to be carried in sight to the vessel-at that distance. The evidence reflects that it was a distinctive quality of Lasala's own vessel that may have prevented him from seeing the light at fifty feet from the platform. Finding that Cantium violated Section 67.05-1(f) because of a characteristic of Lasala's own vessel would mean that platform owners would be required to make sure that nav aid lights are visible to every possible vessel at fifty feet away regardless of the idiosyncratic or distinctive feature of such vessels. The Court finds Cantium's expert Captain Dinapoli's testimony credible on this point when he testified that it would be nonsensical to require a rig owner to contemplate each of a thousand combinations which a vessel operator could employ to obstruct visibility, from adding a top to a boat to putting on a baseball cap with a bill.[220] Such a broad reading of the regulation leads to an absurd result in an apparent violation of the intent of the drafters of the regulation, and therefore is rejected by the Court.[221] In light of the evidence introduced at trial, the Court finds that the light could be seen from 50 feet away, and as far away as 96 feet away from the platform, but Lasala's visibility of the light at fifty feet away from the platform may have been impaired by the T-Top of Lasala's vessel.[222]

---

[219] 33 C.F.R. § 67.05-1(f).

[220] June 22, 2021 Trial Testimony of Richard Dinapoli at 148-149.

[221] *See Caesar v. Barnhart*, 191 F. App'x 304, 305 (5th Cir. 2006) (holding the Court should reject readings of regulations which lead to absurd results).

[222] June 22, 2021 Trial Testimony of Robert Bartlett at 68.

Cantium also violated 33 C.F.R. § 67.40-1. That regulation provides that when a platform owner plans to commence work on a Class A structure such as the MP 37 BE, notification must be given to the District Commander of the Coast Guard. Although there is evidence in the record that Chevron informed Minerals Management Service (MMS) of alterations to the platform in 2002, there is no evidence that the Coast Guard was apprised of the changes to the platform. Had the Coast Guard had been so apprised, the Coast Guard may have informed Chevron (and by extension, Cantium), that two nav aid lights are required. That said, breach of this regulation does not invoke the Pennsylvania Rule. In order for the Pennsylvania Rule to apply, "the injury suffered must be of a nature that the statute or regulation was intended to prevent."[223] Section 67.40-1 is designed to apprise the Coast Guard of ongoing work to platforms and ensure that the platforms are appropriately lit during that work. It is not designed to present allisions years after the work is completed such as the one that look place here. Accordingly, the Court does not find that the breach of 33 C.F.R. § 67.40-1 by Cantium (or its predecessor) is a substantial cause of the allision.

The Court does not find that Cantium violated 33 C.F.R. § 67.05-10, which requires that a nav aid light be flashing. The Court has determined that the nav aid light was functioning as intended on the night of the allision, including finding that the light was flashing.

---

[223] *In re Marquette Transportation Co.*, 292 F. Supp. 3d at 729.

In summary, the Court finds that Cantium violated 33 C.F.R. § 67.05-1 for failing to have two lights on the platform and rejects the other theories under which Lasala seeks to hold Cantium liable. Such a regulatory violation constitutes negligence *per se* and triggers application of the Pennsylvania Rule. Accordingly, the Court finds Cantium at least partly at fault for the accident.

### 3. *Conclusion as to Liability*

Finally, the Court must apportion liability between the two parties it has found at fault for the allision. "It is a fundamental rule in admiralty law that damages 'are to be apportioned on the basis of the comparative fault of the parties.'"[224] "District courts have considerable discretion in assigning comparative fault."[225] The Court has found that Lasala was at fault in at least five significant ways: (1) leaving safe harbor after being made aware of mechanical issues with the vessel; (2) turning off the radar while simultaneously increasing speed, all the while navigating at night in open water with numerous platforms; (3) not appointing or even requesting lookout help from his passengers; (4) choosing to continue to a harbor hours away rather than returning to safety on a nearby island or other harbor, including the route taken to do so; and (5) failing to see the platform or the nav aid light. The Court has also noted that Lasala failed to alert his passengers to a potentially dangerous situation or have them don their personal flotation devices prior to the allision. The Court has found that Cantium was at fault for failing to have two nav aid lights on the platform as

---

[224] *In re Marquette Transportation Co.*, 292 F. Supp. 3d at 734 (quoting *Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1469 (5th Cir. 1991)).
[225] *Id.*

required by federal regulations. Further, neither Lasala nor Cantium have proven that their rule violations were not a substantial contributing cause of the allision. While the Court has found both Lasala and Cantium negligent as extensively detailed, it notes that Cantium's negligence pales in comparison to Lasala's negligence. Having considered the comparable fault of the parties, the Court finds that Lasala is 85% liable for the allision, and that Cantium is 15% liable for the allision.

### B.    Damages

Damages which are recoverable under general maritime law include "monetary recovery for past and future loss of earning capacity and wages, past and future medical expenses, and pain and suffering resulting from an injury caused by the defendant's negligence."[226] "Past lost wages are usually measured by the actual wage losses incurred by the plaintiff from the date of the accident to the date of trial."[227] "The sum is determined by calculating the amount of money the plaintiff would have earned had he continued at his pre-accident employment, less any wages he earned since the accident."[228] As to future lost wages, "it is assumed that if the party had not been disabled, he would have continued to work, and to receive wages at periodic intervals until retirement, disability, or death. An award for impaired earning capacity is intended to compensate the worker for the diminution in that

---

[226] *Associated Terminals of St. Bernard, LLC v. Potential Shipping HK Co. Ltd.*, 324 F. Supp. 3d 808, 823 (E.D. La. 2018) (quoting *Baham v. Nabors Drilling USA, LP*, 721 F. Supp. 2d 499, 516 (W.D. La. 2010)).
[227] *Id.* (quoting *Baham*, 721 F. Supp. 2d at 516).
[228] *Id.* (quoting *Baham*, 721 F. Supp. 2d at 516).

stream of income."[229] "The paramount concern of a court awarding damages for lost future earnings is to provide the victim with a sum of money that will, in fact, replace the money that he would have earned."[230] Future lost wages are calculated by determining the difference between what a party could have earned "but for" the accident and what he is able to earn when he returns to work in his partially disabled state.[231] "In the maritime context, an award for lost wages must be based on after-tax earnings."[232] "[A]n award for damages cannot stand when the evidence to support it is speculative or purely conjectural."[233]

Further, in a maritime tort case, a court may award damages for pain and suffering.[234] "An award for pain and suffering may include a sum for mental anguish and physical discomfort, and for the mental and physical effects of the injury on the plaintiff's ability to engage in those activities which normally contribute to the enjoyment of life."[235] "Damages for pain and suffering are not subject to precise measurement."[236] Rather "any amount awarded for pain and suffering depends to a great extent on the trial court's observation of the plaintiff and its subjective determination of the amount needed to achieve full compensation."[237]

---

[229] *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 553 (1983).
[230] *Associated Terminals of St. Bernard,* 324 F. Supp. 3d at 823 (quoting  *Martinez v. Offshore Specialty Fabricators, Inc.*, 481 Fed. App'x 942, 949 (5th Cir. 2012)).
[231] *Id.* at 824.
[232] *Associated Terminals of St. Bernard, LLC v. Potential Shipping HK Co. Ltd.*, 324 F. Supp. 3d 808, 824 (E.D. La. 2018) (Africk, J.) (quoting *Ledet v. Smith Marine Towing Corp.*, No. 10-1713, 2011 WL 1303918, at *12 (E.D. La. Apr. 4, 2011) (Vance, J.)).
[233] *Masinter v. Tenneco Oil Co.*, 929 F.2d 191, 194 (5th Cir. 1991).
[234] *See Casaceli v. Martech Intern., Inc.*, 774 F.2d 1322 (5th Cir. 1985).
[235] *Associated Terminals of St. Bernard,* 324 F. Supp. 3d at 825 (quoting *Baham v. Nabors Drilling USA, LP*, 721 F. Supp. 2d 499, 515 (W.D. La. 2010)).
[236] *Id.*
[237] *Hyde v. Chevron U.S.A., Inc.*, 697 F.2d 614, 623 (5th Cir. 1983).

The Court first addresses the proper computation of past medical expenses. At trial, Lasala orally moved that the Court award Presser only the amount *paid* by his insurers, rather than the amount billed by medical professionals. In doing so, Lasala relied on *Higgs v. Costa Crociere S.P.A. Company*,[238] an Eleventh Circuit opinion.  In *Higgs*, a maritime tort case, the Eleventh Circuit noted that "courts across the country have struggled to calculate medical damages in tort cases when medical bills overstate expenses."[239] The Court quoted from the Fifth Circuit, stating "State laws differ as to their approach to written-off expenses in tort cases; within [the Fifth Circuit] alone, three different rules prevail."[240] After reviewing the purpose and application of the collateral source rule, the Eleventh Circuit stated that "categorically adopting the amount billed as the measure of recovery would routinely give plaintiffs unreasonably large damages awards, unjustifiable in law or fact."[241] The Eleventh Circuit continued by cautioning that it could also not say that the amount paid by insurers "is categorially a better approximation of the reasonable value of a provider's medical services" and that the panel "cannot say as a matter of law that the amount paid is any more likely to reflect reasonable value than the amount billed."[242] The Eleventh Circuit concluded that a bright-line rule awarding damages based on either the amount billed by providers or the amount paid by insurers in maritime negligence cases would be inappropriate. To resolve this conflict,

---

[238] 969 F.3d 1295 (11th Cir. 2020).
[239] *Id.* at 1310.
[240] *Id.* (quoting *Deperrodil v. Bozovic Marine, Inc.*, 842 F.3d 352 (5th Cir. 2016)).
[241] *Id.* at 1312.
[242] *Id.* at 1312-13.

the Court held that "it is wiser to leave the ultimate determination—the reasonable value of medical services received by a particular plaintiff in a particular case—to the [factfinder], upon its consideration of all relevant evidence, notably including the amount billed, the amount paid, and any expert testimony and other relevant evidence the parties may offer."[243]

As the factfinder in this bench trial, the Court finds that on these facts the amount paid to medical providers, whether by the insurer or the insured, is the appropriate amount to consider when calculating past medical damages.[244] The Court makes this finding for legal, practical, and logical reasons. Although the Fifth Circuit has not expressly adopted the reasoning of *Higgs* in general maritime tort cases, it has indicated a reluctance to award the amount-billed in the Longshore and Harbor Workers' Compensation Act and maintenance and cure settings.[245] In *Manderson v. Chet Morrison Contractors, Inc.*, the Fifth Circuit explained:

> Our court has repeatedly held an injured seaman may recover maintenance and cure only for those expenses "actually incurred." *E.g.*, *Davis*, 18 F.3d at 1246; *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002). Accordingly, the relevant amount is that needed to satisfy the seaman's medical charges. This applies whether the charges are incurred by a seaman's insurer on his behalf and then paid at a written-down rate, or incurred and then paid by the seaman himself, including at a discounted rate. Thus, in [plaintiff] Manderson's case, regardless of what his medical providers charged, those charges were satisfied by the much lower amount paid by his insurer. Consequently,

---

[243] *Higgs*, 969 F.3d at 1313-14.

[244] The Court notes that this decision is in line with decisions of other divisions of this Court in related contexts. *See, e.g., Koch v. United States*, No. 13-205, 2015 WL 4129312, at *6-7 (E.D. La. July 7, 2015); *Fairley v. Art Catering, Inc., et al*, No. 16-3488, 2018 WL 705871 (E.D. La. Feb. 5, 2018). That said, the Court has determined the proper measure of medical damages based on the facts of this case.

[245] *See Deperrodil*, 842 F.3d at 361 (LHWCA); *Manderson v. Chet Morrison Contractors, Inc.*, 666 F.3d 373, 381 (5th Cir. 2012) (maintenance and cure).

the district court erred by awarding the higher, charged (but not totally paid) amount.[246]

The Fifth Circuit addressed the same issue in the context of a maritime tort action for injuries a plaintiff sustained on a vessel operated by a third party tortfeasor.[247] The issue before the court in *Deperrodil v. Bezovic Marine, Inc.* was "whether the maritime collateral-source rule allows plaintiffs to recover the amount billed, or only the amount paid."[248] In reversing the trial court, which allowed the plaintiff to recover the amount billed, but not paid, the Fifth Circuit held, "Although *Manderson* is not binding—it involved maritime cure, not a maritime tort or LHWCA insurance—it is the most applicable of the various approaches to write-offs. Moreover, its rationale is very persuasive because maritime cure and LHWCA insurance create similar obligations for employers."[249] While *Manderson* and *Deperrodil* are not precisely on point as they involve the payment of maintenance and cure or benefits under the LHWCA, the reasoning remains helpful to this Court.

The Court has also conducted a fact-specific analysis as suggested by *Higgs,* and applied it to the specific facts of this case. The Court begins with the purpose of an award for past medical damages—to make a person whole. Under the facts of this case, allowing or ordering payment of an amount billed, though not paid by either the insured or his insurer, goes far beyond making the person whole. The Court points to a summary of medical costs provided by Dale Presser, unopposed by any party, to

---

[246] 666 F.3d 373, 381 (5th Cir. 2012).
[247] *Deperrodil v. Bozovic Marine, Inc.*, 842 F.3d 352 (5th Cir. 2016).
[248] *Id.* at 359.
[249] *Id.* at 360.

support this conclusion.[250] Presser was billed $305,389.56; he and his insurer paid $44,062.23, resulting in a write off of $254,276.92.[251] In this case, allowing for past medical damages in the amount of $254,276.92, the amount billed but not paid by either Presser or his insured, would result in an excessive windfall of over $200,000 for Presser. Similarly, C.P. provided an unopposed summary reflecting medical bills of $24,361.40. Of this amount, $1,254.61 was paid by Presser (or his attorney) and $3,270.65 by his insurer resulting in a write-off of $16,853.14.[252] The Pressers are "made whole" from past medical expenses by recovering the amount either they or their insurer paid to medical providers.

The same analysis applies to Lasala. On August 23, 2021, the Court issued an order requesting additional briefing from Lasala.[253] In response, Lasala provided a Summary of Medical Costs, as allowed by Federal Rule of Evidence 1006.[254] No party objected to his Summary of Medical Costs. Lasala's Summary of Medical Expenses showed that he was billed $158,088.10 in medical expenses; he and his insurer(s) paid $30,528.51.[255] Lasala is made whole by recovering the amount paid to his medical providers. The Court also determines that relying on the amount actually paid is a

---

[250] Exhibit 1.

[251] *Id.* The Court notes the approximately $7,000 difference between the amount paid by Presser and/or his insured and the amount of the write off but finds this difference to be negligible. Even if this difference were accounted for, it would not change the Court's finding in this regard.

[252] Exhibit 2. The Court also notes a difference of $2,983.00 which is the same amount billed for C.P.'s MRI from Slidell Memorial Hospital on May 18, 2018. The Court is unable to determine why this $2,983.00 is not included in the summary but its inclusion would not alter the Court's analysis. If C.P. establishes that the amount of $2,983.00 was paid by either the Pressers, their attorneys or the Presser's insurance in satisfaction of the bill, it should be included in the award for medical damages.

[253] R. Doc. 301.

[254] R. Doc. 302.

[255] *Id.*

logical and practical calculation of past medical expenses, noting the truism espoused in *Higgs* that in today's world, the amount billed "only ever exists on paper and no one—not the insurer, not the provider, not the taxpayer, and not the plaintiff—was ever responsible for paying it."[256] In this case, a much lower payment than what was billed satisfied the outstanding bills. This fact confirms the truism discussed in *Higgs*. Further, the amount paid is not some nebulous amount subject to variations based on a number of factors; instead, it is a firm, documented amount which was actually paid in satisfaction of the bills. Of course, the same logic and ruling applies to all of the parties seeking damages for past medical expenses, including Lasala.

Accordingly, the Court determines that the appropriate measure of medical damages in this matter is the amount paid to the medical providers. Lasala's oral motion made at trial is granted.

Finally, "[I]n maritime cases the award of prejudgment interest is the rule, rather than the exception, and the trial court has discretion to deny prejudgment interest only where peculiar circumstances would make such an award inequitable."[257] The parties have identified no such peculiar circumstances, nor has the Court identified any. Accordingly, the parties are entitled to reasonable prejudgment interest on their claims dating back to April 28, 2018, the date of the allision, to the date of the entry of judgment. The interest rate amount shall be calculated at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the

---

[256] *Higgs*, 969 F.3d at 1315.
[257] *Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp.*, 71 F.3d 198, 204 (5th Cir. 1995).

calendar week preceding the allision.[258] Post-judgment interest shall accrue from the date of the judgment in accordance with 28 U.S.C. § 1961(a).

       1.    *Lasala's Proven Damages*

          a.    *Lasala's General Damages*

The Court first addresses Lasala's request for $1,500,000.00 in general damages.[259] The Court does not doubt that the allision was traumatic for Lasala, and that he experienced a difficult recovery. That said, the Court found Lasala's testimony regarding general damages not entirely credible. Lasala testified to the social and emotional impact of the allision, testifying that he "lost friends"[260] in the other passengers afterwards, but it was unclear how close he was to the other passengers before the allision or whether or how much the relationships have deteriorated. Lasala also testified that he lost friends as a result of his divorce which he initiated weeks after the allision.[261] Additionally, Rechel Lasala, Lasala's ex-wife with whom he is currently romantically involved, confirmed that she secretly recorded both Dr. and Mrs. Presser within two weeks of the accident and also recorded Lasala's treating doctors. Thus it is unclear to the Court whether any loss of friends was due to the allision, the divorce, the secret recordings, or some combination of these things.

---

[258] *See Drinnon Marine, LLC v. Four Rivers Towing of Alabama, LLC*, No. 19-12485, 2021 WL 3048351, at *11 (E.D. La. July 19, 2021).
[259] R. Doc. 273 at 7.
[260] June 17, 2021 Trial Testimony of Gabriel Lasala at 86, 92.
[261] *Id.* at 86.

Further, Lasala is still able to enjoy many of the recreational activities he could participate in before the allision, including flying a plane solo.[262] Notedly, Rechel Lasala, testified that Lasala was getting back to his old self and "as far as his personality, his, he's, I think, the same."[263] She also testified to the many trips, including ski trips, Lasala has been able to enjoy with his family since the allision.[264] While her testimony speaks for itself, the Court notes that Rechel Lasala was unable to enunciate any reason whatsoever for the Lasalas' separation less than two weeks following the allision and subsequent divorce, after more than 20 years together, and now apparent reconciliation. Ms. Lasala also testified that Lasala has been paying her more than what was agreed to in their prenuptial agreement. Although awards of $1,500,000.00 have been affirmed when a plaintiff was pinned down and had "disfigured" hands, the basis for the affirmation of that award was the broad discretion of the factfinder.[265] The Court is also mindful of the extent of Dr. Presser's injuries and finds that an award of $1,500,000.00 to Dr. Lasala, whose injuries were significantly less serious than Presser's, would be inconsistent with the award to Presser. In its broad discretion to determine general damages, the Court finds that a general damages award of $750,000.00 is more appropriate under these circumstances.

---

[262] *See, e.g.*, *id.* at 174-75 (demonstrating he recently took a trip to Alaska) and 183; *see also* Exhibit 147 (Text Message from Lasala demonstrating that he still skis).
[263] June 18, 2021 Trial Testimony of Rechel Lasala at 279.
[264] *Id.* 283-85.
[265] *See Thornton v. National RR Passenger Corp.*, 802 So. 2d 816, 823-24 (La. App. 4 Cir. 2001).

b.    *Lasala's Past Medical Costs*

Lasala also seeks costs for medical bills in the amount of $220,000.00.[266] The Court has already determined that the appropriate amount of past medical damages is the amount paid to medical providers in satisfaction of the medical bills. Lasala has provided an unopposed Summary of Medical Bills which reflect that $30,528.51 was paid to satisfy his medical bills.[267] Lasala has established past medical costs of this amount. Therefore, the Court orders an award of $30,528.51, the amount paid to satisfy Lasala's medical bills, to Lasala for past medical damages.

c.    *Lasala's Future Medical Costs*

Lasala also seeks future medical damages in the amount of $50,000.00.[268] The Court does not find that Lasala has proven this amount of future medical damages. The evidence elicited at trial was that Lasala did not return for any additional treatment in late 2018 or anytime in 2019 or 2020. Further, although Dr. Celentano testified that Lasala's condition would likely require a removal of the plates and screws and a fusion of the joint at some point in the future, he offered no opinion as to the timeframe for any future medical procedure. There is no medical testimony to justify an award of future medical damages that would not be speculative. An award for damages cannot stand when the only evidence to support it is speculative or purely

---

[266] *See* R. Doc. 273 at 8 and Exhibits 92-101. The court has already noted that Lasala's subsequent Summary of Medical Costs, R. Doc. 302, showed only $158,088.10 in total billed medical costs. Lasala has not accounted for seeking $220,000 in past medical bills.

[267] R. Doc. 302.

[268] R. Doc. 273.

conjectural.[269] Accordingly, the Court denies Lasala's claim for future medical damages.

### d.    *Lasala's Past Wages*

Lasala seeks $629,544.00 in past lost wages.[270] The allision occurred on April 28, 2018. Dr. Celentano's medical records indicate that Lasala was released to perform surgeries in July 2018.[271] Although neither Lasala nor Dr. Celentano were able to testify to his exact release date, Lasala confirmed that he returned to do surgeries within a few days of the July 9, 2018 date.[272] The Court has no evidence to contradict that Lasala returned to work at or near that time. Lasala also testified regarding his work that "from my physical limitations, I don't think that that changed a lot" although "it has decreased my income."[273] What Lasala failed to provide to the Court, however, was any expert testimony or analysis to connect any of Lasala's lost work with a concrete amount of past wages. Lasala's testimony that "he was making between $1.2 and $1.3 million and I'm making about one million now,"[274] is insufficient to provide the Court with any concrete figure in which to award past wages. Instead, Lasala has provided his Proposed Findings of Fact which state, "Based upon gross wages less taxes for calendar years 2015, 2016, and 2017, the average net wages are $741,017. Using $741,017 as base, net wage losses for 2018, 2019, 2020 total $629,544, i.e. Past Wage Losses."[275] Although that number is

---

[269] *Haley v. Pan American World Airways,* 746 F.2d 311 at 316 (5th Cir.1984).
[270] R. Doc. 235.
[271] Exhibit 95A.
[272] June 17, 2021 Trial Testimony of Gabriel Lasala at 182-183.
[273] *Id.* at 86, 175.
[274] *Id.* at 87.
[275] R. Doc. 235.

specific, Lasala never explained how he calculated it or from what record evidence it is derived.  Such a statement is conclusory and insufficient to establish with any degree of certainty a past wage loss. Further, while Lasala's tax returns are in the record,[276] Lasala has failed to provide any analysis of the records to support a past wage claim. Because Lasala has failed to establish a past wage loss with any reasonable amount of certainty, the Court declines to award such.

    e. *Lasala's Future Wages*

   Lasala makes a future wage loss claim of $4,329,531.00 based on a retirement at age 70. "To obtain an award for future lost wages or earning capacity, a plaintiff must present medical evidence indicating with reasonable certainty that there exists a residual disability causally related to the accident."[277] The Court accepts the stipulated testimony of Nancy Favaloro, a licensed rehabilitation counselor, that only four percent of the total cardiology workforce is ten years past their sixtieth birthday. That said, Lasala testified that he hopes to continue to work until 73, the same age he planned on working to prior to the accident, and no medical or vocational testimony undermined that testimony.[278] Lasala has not provided any other support for an award for a future wage loss claim. There is no expert or lay testimony reflecting when Lasala may stop working and his own testimony revealed no expectation of doing so. As noted earlier, "an award for damages cannot stand when the evidence to support it is speculative or purely conjectural."[279] Lasala has not

---

[276] Exhibit 12.
[277] *Purvis v. Jefferson Par. Hosp. Serv.*, 209 So. 3d 363, 378 (La. App. 5th Cir. 2016).
[278] June 17, 2021 Trial Testimony of Gabriel Lasala at 87-88.
[279] *Masinter v. Tenneco Oil Co.*, 929 F.2d 191, 194 (5th Cir. 1991).

provided the Court with any reasonable basis to make an award for future wage loss that would not be conjecture on the part of the Court. Indeed, the bulk of the evidence runs the other way.  Lasala, by his own testimony, suggested he hoped to work until 73, and given the wide range of activities he still engages in, there is no reasonable basis to conclude he could not do so.  Therefore, the Court rejects Lasala's claim for future wage losses.

f.     *Lasala's Miscellaneous Damages*

The Court further rejects Lasala's testimony that his injuries required him to hire a household cleaning service at $1,200.00 per month. First, the Court does not find that the need for those services was borne out by the evidence. Indeed, Lasala testified that his ex-wife shouldered most of the household responsibilities before their divorce so it is not clear to the Court whether any need for household assistance is the result of the allision or the divorce.[280] Additionally, the Court notes that Lasala's treating physician testified that Lasala's other hand is completely usable and he can do household chores within reason.[281] Finally, the Court finds it difficult to reconcile that Lasala is able to perform heart surgeries and fly a plane solo, among other things, yet not clean his home and fold his clothes. Lasala also made a claim for future office help until he reaches the age of 70.[282] There was no evidence introduced in the trial to support this claim. The Court denies Lasala's request for future expenses.

---

[280] June 17, 2021 Trial Testimony of Gabriel Lasala at 182-83.
[281] June 18, 2021 Trial Testimony of Dr. Richard Celentano at 36-37.
[282] R. Doc. 273.

In total, the Court finds that Gabriel Lasala has established total damages in the amount of $780,528.51 plus reasonable prejudgment interest.

    2.    *Dale Presser's Proven Damages*

        a.    *Dale Presser's General Damages*

Dale Presser seeks $350,000.00 for past pain and suffering and $650,000.00 in future pain and suffering, for a total of $1,000,000.00 in general damages. Here, the allision was most traumatizing for Presser, who, while trapped under the vessel's T-Top for some time, was also focused on the well-being of his minor son, not knowing for a time whether he had been killed or significantly injured in the accident. He has had significant medical procedures to recover from the allision, including skin grafts. His leg will be permanently altered. He has changed his medical practice to accommodate his injuries. The evidence established that he can no longer enjoy the recreation he previously enjoyed, including skiing and outdoor activities with his family. The Court found Presser's testimony credible and supported by that evidence. In light of these extreme and unfortunate effects of the allision on Presser's physical well-being and his loss of enjoyment of life, the Court finds that an award of $350,000.00 for past pain and suffering and $650,000.00 in future pain and suffering is most appropriate.

        b.    *Dale Presser's Past Medical Damages*

Dale Presser was billed for $305,389.56 in medical damages. The Court has determined that the appropriate measure of medical damages in this matter is the

amount paid. The amount paid to satisfy the bills was $44,062.23.[283] The Court finds that Presser has properly established that he is entitled to $44,062.23 in past medical costs. The Court further notes that Presser does not seek future medical costs.

### c. *Dale Presser's Past Wages*

Presser's economist, Randy Rice, opined that Presser experienced a past wage loss of $348,033.00.[284] With that said, he confirmed in his testimony that he did not review Presser's 2019 tax return in reaching this calculation.[285]  Instead, Rice testified that it was correct that his work was "simply to calculate—calculation scenarios based on information provided by Dr. Presser's lawyers."[286] The more concrete and reliable testimony came from Sally Presser, Dale Presser's wife and the financial manager for his business. Mrs. Presser testified in detail regarding her husband's injuries and the impact on his day-to-day activities, both at home and in his office.[287] She was very credible in relating her husband's inability to work a full caseload for 3-4 months following the accident. Following her review of the billing records, Mrs. Presser testified that her husband lost close to $200,000-$250,000 in billing during the months that he was unable to work following the allision.[288] Presser's economist confirmed that amount, opining that the loss was $215,000.00.[289]

---

[283] Exhibit 1.
[284] June 18, 2021 Trial Testimony of Dr. Randolph Rice at 82.
[285] *Id.* at 90.
[286] *Id.* at 91.
[287] June 21, 2021 Trial Testimony of Sally Presser.
[288] *Id.* at 34.
[289] June 18, 2021 Trial Testimony of Dr. Randolph Rice at 81-82.

An award for lost wages must be based on after-tax earnings.[290] Dr. Rice concluded that Dr. Presser's after tax wage loss was $126,850.00.[291] The Court is satisfied based on the evidence presented that Presser suffered a past wage loss of $126,850.00.

The Court next addresses the expense of a nurse practitioner as part of Dale Presser's past lost wages. Presser seeks damages for past and future wage losses based on the expenses in hiring a nurse practitioner to assist in his office following the allision at a cost of $120,000.00 per year. The Court is satisfied from the testimony of the Pressers that Dr. Presser had no intention of hiring a nurse practitioner prior to the allision.[292] The Court is further satisfied from the testimony of Presser and his doctors that the hiring was necessitated by Presser's injuries and physical limitations resulting from the allision.[293] The Court awards Presser additional past wage losses of $120,000.00 per year from the time of hiring the nurse practitioner, February 18, 2019, until the trial.[294] Thus, Presser has carried his burden of establishing past lost wages of $126,850.00 plus the cost of the nurse practitioner from date of hire until trial at a rate of $120,000.00 annually.

---

[290] *Associated Terminals of St. Bernard, LLC v. Potential Shipping HK Co. Ltd*., 324 F. Supp. 3d 808, 824 (E.D. La. 2018)(quoting *Ledet v. Smith Marine Towing Corp*., No. 10-1713, 2011 WL 1303918, at *12 (E.D. La. Apr. 4, 2011)).

[291] *Id.*

[292] June 21, 2021 Trial Testimony of Dale Presser at 81; June 21, 2021 Trial Testimony of Sally Presser at 25-27,48.

[293] *Id.*

[294] June 18, 2021 Trial Testimony of Dr. Randolph Rice at 82. If the hire date of the nurse practitioner as testified to by Dr. Rice is inaccurate, the Court intends for the award to be from the correct date of hire.

d.    *Dale Presser's Future Wages*[295]

At trial, Dr. Ramy El Khoury testified that Presser has a permanent right leg neuropathy due to right femoral nerve damage, which will worsen over time.[296] Dr. El Khoury testified that Presser's injuries will impact his work-life expectancy, but that he would defer to Presser to reasonably determine his work-life expectancy.[297] Dr. Randolph Rice, Presser's economic expert, offered opinions concerning the future losses that Presser may face depending on when he stops performing surgeries.[298] Dr. Rice's opinions regarding lost wages were based on suppositions of Presser's future work-life expectancy from age 55, 60, 65, and 70.[299] Dr. Rice testified that he simply relied on assumptions given to him about when Presser would stop working, and had no medical or other evidence to support when Presser would likely stop working.[300] Further, Dr Rice, testified in response to a question regarding future wage losses that he could not reconcile some numbers and "I don't know how to reconcile those. You'd have to ask the people that gave me the data to work with."[301] While the Court does not question Dr. Rice's expertise, it questions the reliability of Dr. Rice's opinions on this issue as the opinions have not been proven to be based on reliable medical or other data or confirmed in some other manner. Instead, his opinions were based on speculation and conjecture as to when Presser might cease either performing surgical

---

[295] Here, the Court addresses Lasala's Motion for a Directed Verdict made on Day 4 of trial regarding Presser's future wages.

[296] *See* June 18, 2021 Trial Testimony of Dr. El Khoury at 150-52, 154; *see also* June 4, 2021 Deposition Testimony of Dr. Daniel Trahant.

[297] *Id.* at 156-58.

[298] June 18, 2021 Trial Testimony of Dr. Randolph Rice at 78-89; *see also* Exhibit 151.

[299] Exhibit 149.

[300] June 18, 2021 Trial Testimony of Dr. Randolph Rice at 101.

[301] June 18, 2021 Trial Testimony of Dr. Randolph Rice at 100.

procedures or his medical practice and based on data which he was unable to authenticate as reliable.

The Court is persuaded that the more reliable and definitive testimony for the Court's consideration in determining future wage loss came from Ralph Litolff, forensic economist, who reviewed and analyzed the Pressers' tax returns, including the return for 2019, the tax return not reviewed by Dr. Rice. Litolff's testimony was that Presser's tax returns revealed an increase in income from all sources subsequent to the allision, thus negating any future wage loss based on suppositions.[302] Litolff testified that he saw "nothing yet to date that Dr. Presser will, in fact, incur any are [sic] future economic damages."[303] Mrs. Presser confirmed that "2019 was the highest grossing year in revenue for Dr. Presser's practice" and that one of the reasons was that he was seeing new patients.[304]

Further corroborating that testimony was the testimony of Martin Fischer, President and CEO of the Cardiovascular Specialty Care Center in which Dr. Presser is a partner. Mr. Fischer testified that Presser's collections from the Center had increased every year since the allision, significantly in 2020.[305] Fischer further testified that he expected that upward trend to continue in the future as the facility was doubling its size in 2021, and that the facility and the partners should see "significant" increased revenue.[306]

---

[302] June 23, 2021 Trial Testimony of Ralph Litolff at 147-148, 152-154.
[303] June 23, 2021 Trial Testimony of Ralph Litolff at 149.
[304] June 21, 2021 Trial Testimony of Sally Presser at 44-45.
[305] June 10, 2021 Deposition Testimony of Martin James Fisher at 46-47.
[306] *Id.*

The paramount concern of a court awarding damages for lost future earnings is to provide the victim with a sum of money that will, in fact, replace the money that he would have earned."[307] The evidence has shown an increase in Presser's income and Presser has failed to provide any evidence to rebut that evidence or show any diminution of income. While Presser's increase in income subsequent to the allision does not necessarily equate to a denial of damages for future lost wages, it is a relevant factor for the Court's consideration, and one that the Court finds weighs against such damages. In addition to a person's prior earnings, other relevant factors include his work record, the likelihood of his ability to earn a certain amount but for the accident and the amount of work-life remaining.[308]

Again, "an award for damages cannot stand when the evidence to support it is speculative or purely conjectural."[309] Here, there is no expert or lay testimony reflecting when Presser may stop working. Although Dr. El Khoury and Dr. Trahant testified that Presser's work-life may be reduced, there is no evidence in the record by which the Court could reasonably determine the number of years by which to calculate such a reduction. Even Presser himself (who is not an expert) testified only vaguely that he didn't "see how I'm going to do them [conduct procedures] to 65 or 70."[310] This statement—which implicitly suggests Presser will try to continue working as long as he can—is so vague that one cannot even make a reasonable guess

---

[307] *Associated Terminals of St. Bernard,* 324 F. Supp. 3d at 823 (quoting *Martinez v. Offshore Specialty Fabricators, Inc.*, 481 Fed. App'x 942, 949 (5th Cir. 2012)).

[308] *Rea v. Wis. Coach Lines, Inc.*, No. 12–1252, 2014 WL 5039591, at *3 (E.D. La. Oct. 8, 2014).

[309] *Masinter v. Tenneco Oil Co.*, 929 F.2d 191, 194 (5th Cir. 1991).

[310] June 21, 2021 Trial Testimony of Dale Presser at 85.

as to how many years Presser lost off his work-life based on it. Indeed, Presser confirmed that he hoped to do procedures as long as he can and Mrs. Presser testified that "his mindset right now is to work as hard as he can, as much as he can, for as long as he can" since their retirement plans have changed because of the accident.[311] While the evidence is clear that Presser intends to continue working, it is unclear from the testimony if Presser will stop work at 65, or at 70, or somewhere between, or sometime before. For the sole evidence by which Presser asks the Court to make this determination, the evidence is far too vague.

The Court finds that Presser has failed to demonstrate by a preponderance of the evidence proof of future lost wages. Presser provides no life care plan, rehabilitation expert, or vocational expert, nor does he provide any statistics or reports from outside sources. Further, he has failed to provide non-speculative evidence addressing relevant factors for the Court to consider to determine loss of future wages such as amount of work-life remaining and the likelihood of his ability to earn a certain amount but for the allision and injury.[312]  Even though courts have at times found that a vocational expert was not an "absolute prerequisite" for a lost future wages claim,[313] there still must be sufficient evidence in the record whereby the Court may make a non-speculative determination of the loss of future wages. There was no such evidence presented here. Because the Court cannot reasonably calculate the number of years Presser may lose in income as a result of the allision,

---

[311] *Id.*; June 21, 2021 Trial Testimony of Sally Presser at 40.
[312] *Pierce v. Milford*, 96–92 (La.App. 3 Cir. 9/25/96), 688 So.2d 1093, 1095.
[313] *See, e.g.*, *Stokes v. Freeport McMoran C&G, Inc.*, No. 14-1538, 2015 WL 13531784, at *3 (E.D. La. Dec. 8, 2015).

if any, or any loss of future income, any award of future lost wages is entirely speculative.

The Court addresses future lost wages with regard to the hiring of the nurse practitioner separately here. The Court has already determined that the hiring of the nurse practitioner was necessitated by Presser's injuries and physical limitations resulting from the allision. While Presser has failed to demonstrate by a preponderance of the evidence proof of future lost wages as detailed above, he has proven by a preponderance of the evidence the need for the nurse practitioner. Further, while Presser has failed to establish with any certainty any end work-life expectancy, he has established that he has every intent to continue his practice presently. Both Dr. Presser and his wife testified that his intent was to continue working for as long as possible.[314] Based on the evidence before the Court, it is reasonable to believe that Presser will continue his medical practice until age 55, at a minimum, which is also the minimum age suggested by his expert economist. As such, the Court awards Presser the cost of the nurse practitioner at $120,000 per year, until Presser reaches the age of 55.

In total, the Court finds that Dale Presser has established total damages in the amount of $1,170,912.23 plus reasonable prejudgment interest, plus the cost of the nurse practitioner at a rate of $120,000.00 annually from the date of hire until the date of trial, as well as the cost of a nurse practitioner at a rate of $120,000 per year until Dr. Presser reaches the age of 55.

---

[314] June 21, 2021 Trial Testimony of Dale Presser at 85; June 21, 2021 Trial Testimony of Sally Presser at 40.

3.    *C.P.'s Proven Damages*

C.P. seeks $45,000.00 in past pain and suffering, as well as $60,000.00 in future pain and suffering.[315] The Court finds that C.P. incurred pain and suffering resulting from the accident. The allision was a traumatic event for all involved, and was likely particularly traumatic for C.P. given his age and the fact that he was aware of his father's significant injuries for hours before rescue and medical attention was received. Further, his injuries prevented him from engaging fully in recreation for months.  The Court therefore finds an award of $50,000.00 in past pain and suffering damages appropriate. The Court does not find, however, that an award of future damages based on any physical injuries C.P. sustained is appropriate in this case. Cases which have allowed for future general damages have involved greater injuries with long-lasting consequences.[316]  C.P. has fully recovered from his physical injuries, fortunately, and his doctor testified that any current treatment C.P. is undergoing is unrelated to the allision. In May of 2018, three weeks after the allision, Dr. Jeremy James, an orthopedic surgeon who was treating C.P., stated his physical exam of C.P.'s neck showed it was "completely normal" and C.P. had no pain.[317] Dr. James further testified that it was his opinion based on his physical examination as well as a subsequent MRI that C.P. had not previously suffered a fractured vertebrae.[318] C.P.

---

[315] *See* R. Doc. 228 at 9.

[316] *See, e.g.*, *Duchamp v. State Farm Mut Auto Ins. Co.*, 916 So. 2d 498 (La. App. 3 Cir. 2005) (awarding future pain and suffering damages to a plaintiff who experienced pain in his neck, back, and legs, and would likely experience chronic pain throughout his lifetime).

[317] June 9, 2021 Deposition Testimony of Dr. Jeremy James at 18.

[318] June 9, 2021 Deposition Testimony of Dr. Jeremy James at 18-22, 26-28, and 37-40. Dr. James also testified that he examined C. P. in May 2021 but opined that any neck injury at that time was not related to the allision. *See* James Deposition at 34.

himself credibly testified that he has recovered from his injuries.[319] The Court finds that C.P. seems to be a  smart, well-adjusted and athletic young adult, with a bright future, notwithstanding the allision. That said, the Court finds that C.P. credibly testified to the how his father's injuries and continued recovery has somewhat impacted their relationship since his father is not able to engage in the number of recreational activities with him as he did prior to the accident. Dr. Presser also testified to those limitations. Accordingly, though the Court has determined that an award for future damages based on C.P.'s physical injuries is not justified, it does find that an award based on the impact on C.P. as a result of the loss of some of those father-son recreational activities is justified and awards $10,000.00 in future pain and suffering.

C.P. was billed for $21,378.40 in medical damages. Of that billed amount, $4,525.26 was paid to the medical providers in satisfaction of the bills. The Court has already determined that the amount paid is the appropriate amount to be considered for past medical damages. The Court finds that C.P. has properly established that he is entitled to $4,525.26 in medical damages.[320] He seeks no other damages beyond those addressed here.

In total, the Court finds that C.P.'s damages are $64,525.26 plus reasonable prejudgment interest.

---

[319] June 18, 2021 trial testimony of C.P. at 76.

[320] *See* fn 249. In Exhibit 2, a summary of C.P.'s medical expenses, the Court notes a difference of $2,983.00 which is the same amount billed for C.P.'s MRI from Slidell Memorial Hospital on May 18, 2018. The Court is unable to determine why this $2,983.00 is not included in the summary. If C.P. establishes that the amount of $2,983.00 was paid by either the Pressers, their attorneys or the Presser's insurance in satisfaction of the bill, the Court intends for it to be included in the award for medical damages.

4.  *Cantium's Damages Proven*

As described in its findings of fact, Cantium has put forth evidence that it sustained damages of $18,282.63 as the result of the allision. The Court finds that the following damages are reasonable consequences of the allision and are recoverable by Cantium:  (1) $9,893.57 for Triton Diving Service, LLC for inspection of platform after allision; (2) $977.01 for RWO Oilfield Consultants, LLC for inspection of platform after allision; (3) $3,355.25 for Fugro USA Marine, Inc. underwater surveys of the platform area, including pipelines; and (4) $1,535.00 for Total Safety for retrieval of the nav aid system batteries and solar panels at the request of the Plaintiffs.[321]  This amount totals $15,760.83.

Foremost contests whether Cantium may recover for Liberty Self Storage for storage of vessel items recovered from the platform ($2,296.61) and Acme Trucking for transport of vessel items recovered from the platform ($225.19).[322] Foremost contends these costs were incurred in preparation for litigation, though it cites no authority in support of this proposition. Even had litigation not been imminent, the items from the vessel would eventually need to be retrieved from the platform. Accordingly, Foremost mischaracterizes the Acme Trucking expenses as incurred in preparation for litigation. Similarly, the items from the vessel could not simply be tossed aside, as had Cantium destroyed the evidence and not preserved it, it may have been subject to a spoilation claim. Accordingly, the Court finds that Foremost

---

[321] The Court notes that in Foremost's and Cantium's joint stipulation, Foremost does not contest that the Total Safety costs may be recovered by Cantium.  *See* R. Doc. 290-3.  Neither Lasala nor the Pressers address this issue.

[322] *See* R. Doc. 290-3 at 3 ¶ 7.

also mischaracterizes the Liberty Self Storage costs and those costs should properly be included in Cantium's damages.

In total, the Court finds that Cantium has established total damages in the amount of $18,282.63 plus reasonable prejudgment interest.

## IV.    CONCLUSION

In summary, the Court finds that Lasala is 85% liable for the allision, and Cantium is 15% liable for the allision. Based on the damages that the Court has found that the parties have established, the Court assesses liability as follows:

Lasala is liable to Dale Presser for $995,275.40 (85% of Dale Presser's calculated award), plus 85% of the cost of the nurse practitioner from date of hire until trial, as well as 85% of the cost of a nurse practitioner at a rate of $120,000 per year until Dr. Presser reaches the age of 55, plus reasonable prejudgment interest.

Lasala is liable to C.P. for $54,846.47 (85% of C.P.'s award), plus reasonable prejudgment interest.

Cantium is liable to Lasala for $101,575.05 plus reasonable prejudgment interest. This takes into account the $117,079.28 Cantium owed Lasala for his damages and includes a $15,504,23 offset for the amount Lasala owed Cantium for its damages.

Cantium is liable to Dale Presser for $175,636.83 (15% of Dale Presser's calculated award), plus 15% of the cost of the nurse practitioner from date of hire until trial, as well as 15% of the cost of a nurse practitioner at a rate of $120,000 per year until Dr. Presser reaches the age of 55, plus reasonable prejudgment interest.

Cantium is liable to C.P. for $9,678.79 (15% of C.P.'s award), plus reasonable prejudgment interest.

The Court will issue a judgment to this effect, which will close docket Nos. 18-cv-11057, 18-cv-11138, 19-cv-9706, and 19-cv-9819.

The Court orders that docket No. 19-cv-9798 be deconsolidated and not closed. The Court will issue a scheduling order in 19-cv-9798 in due course.

**IT IS SO ORDERED.**

New Orleans, Louisiana, October 29, 2021.

**WENDY B. VITTER**
**UNITED STATES DISTRICT JUDGE**